## PRESEAULT ET UX. *v.* INTERSTATE COMMERCE COMMISSION ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SECOND CIRCUIT

No. 88–1076.   Argued November 1, 1989—Decided February 21, 1990

1

BRENNAN, J., delivered the opinion for a unanimous Court.  O'CONNOR, J., filed a concurring opinion, in which SCALIA and KENNEDY, JJ., joined, *post*, p. 20.

*Michael M. Berger* argued the cause for petitioners.  With him on the briefs were *Clarke A. Gravel, Richard E. Davis,* and *T. Christopher Greene.*

*Brian J. Martin* argued the cause for the federal respondents.  With him on the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Carr, Deputy Solicitor General Wallace, Anne S. Almy, James E. Brookshire, Robert S. Burk,* and *Ellen D. Hanson.  John K. Dunleavy,* Assistant Attorney General, argued the cause for

4

respondents State of Vermont et al. With him on the brief were *Jeffrey L. Amestoy*, Attorney General, and *John T. Leddy*.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented is the constitutionality of a federal "rails-to-trails" statute under which unused railroad rights-of-way are converted into recreational trails notwithstanding whatever reversionary property interests may exist under state law. Petitioners contend that the statute violates both the Fifth Amendment Takings Clause and the Commerce Clause, Art. I, § 8. We find it unnecessary to evaluate the merits of the takings claim because we hold that even if the rails-to-trails statute gives rise to a taking, compensation is available to petitioners under the Tucker Act, 28 U. S. C.

*Briefs of *amici curiae* urging reversal were filed for the American Farm Bureau Federation et al. by *John J. Rademacher* and *Richard L. Krause;* for the Missouri Farm Bureau Federation et al. by *Ron McMillin* and *Lori J. Levine;* for the National Association of Realtors by *Ralph W. Holmen;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Edward J. Connor, Jr.*

Briefs of *amici curiae* urging affirmance were filed for Montgomery County, Maryland, by *Fritz R. Kahn* and *Clyde H. Sorrell;* for the Iowa Association of County Conservation Boards et al. by *Charles H. Montange;* for the National Association of Counties et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch, James L. Quarles III,* and *Jerold S. Kayden;* and for the Rails-to-Trails Conservancy et al. by *Robert Brager, David M. Friedland,* and *David Burwell.*

Briefs of *amici curiae* were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *N. Gregory Taylor* and *Theodora P. Berger,* Assistant Attorneys General, *Dennis M. Eagan, Craig C. Thompson,* and *Terry T. Fujimoto,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Robert A. Butterworth* of Florida, *Thomas J. Miller* of Iowa, *Frederick J. Cowan* of Kentucky, *Frank J. Kelley* of Michigan, *Brian McKay* of Nevada, *Stephen E. Merrill* of New Hampshire, *Nicholas Spaeth* of North Dakota, *Anthony J. Celebrezze, Jr.,* of Ohio, *Ernest D. Preate, Jr.,* of Pennsylvania, *Roger A. Tellinghuisen* of South Dakota, *R. Paul Van Dam* of Utah, and *Charles G. Brown* of West Virginia; and for the National Association of Reversionary Property Owners by *Daryl A. Deutsch.*

§ 1491(a)(1) (1982 ed.), and the requirements of the Fifth Amendment are satisfied. We also hold that the statute is a valid exercise of congressional power under the Commerce Clause.

I

A

The statute at issue in this case, the National Trails System Act Amendments of 1983 (Amendments), Pub. L. 98–11, 97 Stat. 48, to the National Trails System Act (Trails Act), Pub. L. 90–543, 82 Stat. 919 (codified, as amended, at 16 U. S. C. § 1241 *et seq.*), is the culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails.[1] In 1920, the Nation's railway system reached its peak of 272,000 miles; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century.[2] Concerned about the loss of trackage, Congress included in the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act), Pub. L. 94–210, 90 Stat. 144, as amended, 49 U. S. C. § 10906 (1982 ed.), several provisions aimed at promoting the conversion of abandoned[3] lines

[1] Many nature trails are operated directly by the Federal Government pursuant to the Trails Act, in which Congress reserved to itself the right to designate scenic and historic trails and delegated to the Secretary of the Interior and the Secretary of Agriculture authority to designate recreational trails and to develop and administer the entire trails system. See 16 U. S. C. §§ 1242–1246. Section 7(e) of the Trails Act, 16 U. S. C. § 1246(e), provides that the land necessary for a designated scenic or historic trail may be acquired by state or local governments or by federal authorities, either through cooperative agreements with landowners or by purchase. In the event that all voluntary means for acquiring the property fail, the appropriate Secretary is given limited power to obtain private lands through condemnation proceedings. See 16 U. S. C. § 1246(g).

[2] See authorities cited in Comment, Rails to Trails: Converting America's Abandoned Railroads Into Nature Trails, 22 Akron L. Rev. 645 (1989); see also 102 ICC Ann. Rep. 44–45 (1988); 101 ICC Ann. Rep. 37–38 (1987).

[3] There is an important distinction in the Interstate Commerce Act between "abandonment" of a rail line and "discontinuance" of service. See

to trails. Section 809(a) of the 4–R Act required the Secretary of Transportation to prepare a report on alternative uses for abandoned railroad rights-of-way. Section 809(b) authorized the Secretary of the Interior to encourage conversion of abandoned rights-of-way to recreational and conservational uses through financial, educational, and technical assistance to local, state, and federal agencies. See note following 49 U. S. C. § 10906 (1982 ed.). Section 809(c) authorized the Interstate Commerce Commission (ICC or Commission) to delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property had first been offered for sale on reasonable terms for public purposes including recreational use. See 49 U. S. C. § 10906 (1982 ed.).

By 1983, Congress recognized that these measures "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H. R. Rep. No. 98–28, p. 8 (1983) (H. R. Rep.); S. Rep. No. 98–1, p. 9 (1983) (S. Rep.) (same). Congress enacted the Amendments to the Trails Act, which authorize the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails. Section 8(d) provides that a railroad wishing to cease operations along a particular route may negotiate with a State, municipality, or private group that is prepared to as-

---

49 U. S. C. § 10903 (1982 ed.). Once a carrier "abandons" a rail line pursuant to authority granted by the Interstate Commerce Commission, the line is no longer part of the national transportation system, and although the Commission is empowered to impose conditions on abandonments, see, e. g., 49 U. S. C. §§ 10905(f)(4), 10906 (1982 ed.), as a general proposition ICC jurisdiction terminates. See *Hayfield Northern R. Co.* v. *Chicago & North Western Transp. Co.*, 467 U. S. 622, 633–634 (1984); 54 Fed. Reg. 8011–8012 (1989). In contrast, "discontinuance" authority allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future.

sume financial and managerial responsibility for the right-of-way.[4]   If the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to ICC-imposed terms and conditions; if no agreement is reached, the railroad may abandon the line entirely and liquidate its interest.[5]

[4] Section 8(d), codified at 16 U. S. C. § 1247(d), provides:

"The Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976, shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs.   Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter [the Trails Act], if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.   If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use."

[5] Under implementing regulations promulgated by the ICC, a railroad may apply to the ICC for either a Certificate of Interim Trail Use or Abandonment (CITU) or, in a proceeding involving the exemption of a route from ICC regulation, a Notice of Interim Trail Use or Abandonment (NITU).   See *Rail Abandonments—Use of Rights-of-Way as Trails*, 2 I. C. C. 2d 591, 628 (1986); 49 CFR § 1152.29 (1988).   A CITU or NITU provides a 180-day period during which the railroad may discontinue service, cancel tariffs, and salvage track and other equipment, and also negotiate a voluntary agreement for interim trail use with a qualified trail operator.   If agreement is reached, interim trail use is thereby authorized. If not, the CITU or NITU automatically converts into an effective certifi-

8

Section 8(d) of the amended Trails Act provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U. S. C. § 1247(d). This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests, subject of course to the ICC's "exclusive and plenary" jurisdiction to regulate abandonments, *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 321 (1981), and to impose conditions affecting postabandonment use of the property. See *Hayfield Northern R. Co.* v. *Chicago & North Western Transp. Co.*, 467 U. S. 622, 633 (1984). By deeming interim trail use to be like discontinuance rather than abandonment, see n. 3, *supra*, Congress prevented property interests from reverting under state law:

> "The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trail use will be considered prior to abandonment." H. R. Rep., at 8–9.

cate or notice of abandonment. Because the ICC had not yet promulgated its final regulations implementing § 8(d) at the time of its decision in the instant case, the Commission did not issue a CITU or NITU.

See S. Rep., at 9 (same). The primary issue in this case is whether Congress has violated the Fifth Amendment by precluding reversion of state property interests.

## B

Petitioners claim a reversionary interest in a railroad right-of-way adjacent to their land in Vermont. In 1962, the State of Vermont acquired the Rutland Railway Corporation's interest in the right-of-way and then leased the right-of-way to Vermont Railway, Inc. Vermont Railway stopped using the route more than a decade ago and has since removed all railroad equipment, including switches, bridges, and track, from the portion of the right-of-way claimed by petitioners. In 1981, petitioners brought a quiet title action in the Superior Court of Chittenden County, alleging that the easement had been abandoned and was thus extinguished, and that the right-of-way had reverted to them by operation of state property law. In August 1983, the Superior Court dismissed the action, holding that it lacked jurisdiction because the ICC had not authorized abandonment of the route and therefore still exercised exclusive jurisdiction over it. The Vermont Supreme Court affirmed. *Trustees of Diocese of Vermont* v. *State*, 145 Vt. 510, 496 A. 2d 151 (1985).

Petitioners then sought a certificate of abandonment of the rail line from the ICC. The State of Vermont intervened, claiming title in fee simple to the right-of-way and arguing in the alternative that, even if the State's interest were an easement, the land could not revert while it was still being used for a public purpose. Vermont Railway and the State then petitioned the ICC to permit the railroad to discontinue rail service and transfer the right-of-way to the city of Burlington for interim use as a public trail under § 8(d) of the Trails Act. By a Notice of Exemption decided January 2, 1986, the ICC allowed the railroad to discontinue service and approved the agreement between the State and the city for interim trail use. See 51 Fed. Reg. 454–455. On February 4, 1986, the

ICC Chairman denied petitioners' application for a stay pending administrative review,[6] and the decision became effective on February 5, 1986. Petitioners' motion for reconsideration and/or clarification was denied on July 17, 1987. The Commission noted that "[i]nevitably, interim trail use will conflict with the reversionary rights of adjacent land owners, but that is the very purpose of the Trails Act." *State of Vermont & Vermont Railway, Inc.—Discontinuance of Service Exemption in Chittenden County*, 3 I. C. C. 2d 903, 908.

Petitioners sought review of the ICC's order in the Court of Appeals for the Second Circuit, arguing that § 8(d) of the Trails Act is unconstitutional on its face because it takes private property without just compensation and because it is not a valid exercise of Congress' Commerce Clause power. The Court of Appeals rejected both arguments. 853 F. 2d 145 (1988). It reasoned that the ICC has "plenary and exclusive authority" over abandonments, *id.*, at 151, and that federal law must be considered in determining the property right held by petitioners. "For as long as it determines that the land will serve a 'railroad purpose,' the ICC retains jurisdiction over railroad rights-of-way; it does not matter whether that purpose is immediate or in the future." *Ibid.* Because the court believed that no reversionary interest could vest until the ICC determined that abandonment was appropriate, the court concluded that the Trails Act did not result in a taking. Next, the court found that the Trails Act was reasonably adapted to two legitimate congressional purposes under the Commerce Clause: "preserving rail corridors for future railroad use" and "permitting public recreational use of trails." *Id.*, at 150. The Court of Appeals therefore dismissed petitioners' Commerce Clause challenge. We granted certiorari. 490 U. S. 1034 (1989).

---

[6] *State of Vermont and Vermont Railway, Inc.—Discontinuance of Service Exemption in Chittenden County*, Docket No. AB–265 (Sub–No. 1X).

## II

The Fifth Amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation." The Amendment "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 314 (1987). It is designed "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.*, at 315 (emphasis in original). Furthermore, the Fifth Amendment does not require that just compensation be paid in advance of or even contemporaneously with the taking. See *Williamson County Regional Planning Comm'n* v. *Hamilton Bank of Johnson City*, 473 U. S. 172, 194 (1985). All that is required is the existence of a "'reasonable, certain and adequate provision for obtaining compensation'" at the time of the taking. *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 124–125 (1974) (quoting *Cherokee Nation* v. *Southern Kansas R. Co.*, 135 U. S. 641, 659 (1890)). "If the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." *Williamson County Regional Planning Comm'n*, *supra*, at 194–195 (quoting *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1013, 1018, n. 21 (1984)).

For this reason, "taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." *Williamson County Regional Planning Comm'n*, *supra*, at 195; see also *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 127–128 (1985); *Monsanto*, *supra*, at 1016; *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 94, n. 39 (1978). The Tucker Act provides ju-

risdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract. See 28 U. S. C. § 1491(a)(1) (1982 ed.); see also § 1346(a)(2) (Little Tucker Act, which creates concurrent jurisdiction in the district courts for such claims not exceeding $10,000 in amount). "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [Claims Court] to hear and determine." *United States* v. *Causby*, 328 U. S. 256, 267 (1946).

The critical question in this case, therefore, is whether a Tucker Act remedy is available for claims arising out of takings pursuant to the Amendments. The proper inquiry is not whether the statute "expresses an affirmative showing of congressional intent to permit recourse to a Tucker Act remedy," but rather "whether Congress has in the [statute] *withdrawn* the Tucker Act grant of jurisdiction to the [Claims Court] to hear a suit involving the [statute] 'founded . . . upon the Constitution.'" *Regional Rail Reorganization Act Cases*, *supra*, at 126 (emphasis in original). Under this standard, we conclude that the Amendments did not withdraw the Tucker Act remedy. Congress did not exhibit the type of "unambiguous intention to withdraw the Tucker Act remedy," *Monsanto*, *supra*, at 1019, that is necessary to preclude a Tucker Act claim. See *Glosemeyer* v. *Missouri-Kansas-Texas R. Co.*, 685 F. Supp. 1108, 1120–1121 (ED Mo. 1988), aff'd, 879 F. 2d 316, 324–325 (CA8 1989).

Neither the statute nor its legislative history mentions the Tucker Act. As indirect evidence of Congress' intent to prevent recourse to the Tucker Act, petitioners point to § 101 of the Amendments which, although it was not codified into law, provides in relevant part that:

> "Notwithstanding any other provision of this Act, authority to enter into contracts, and to make payments, under this Act shall be effective only to such extent or in such amounts as are provided in advance in appropria-

tion Acts." 97 Stat. 42, note following 16 U. S. C. § 1249.

Petitioners contend that this section limits the ICC's authority for conversions to those not requiring the expenditure of any funds and to those others for which funds had been appropriated in advance. Thus, any conversion that could result in Claims Court litigation was not authorized by Congress, since payment for such an acquisition would not have been approved by Congress in advance. Petitioners insist that such *unauthorized* Government actions cannot create Tucker Act liability, citing *Hooe* v. *United States*, 218 U. S. 322, 335 (1910), and *Regional Rail Reorganization Act Cases, supra,* at 127, n. 16.

We need not decide what types of official authorization, if any, are necessary to create federal liability under the Fifth Amendment, because we find that rail-to-trail conversions giving rise to just compensation claims are clearly authorized by § 8(d). That section speaks in capacious terms of "interim use of *any* established railroad rights-of-way" (emphasis added) and does not support petitioners' proposed distinction between conversions that might result in a taking and those that do not. Although Congress did not explicitly promise to pay for any takings, we have always assumed that the Tucker Act is an "implie[d] promis[e]" to pay just compensation which individual laws need not reiterate. *Yearsley* v. *W. A. Ross Construction Co.*, 309 U. S. 18, 21 (1940). Petitioners' argument that specific congressional authorization is required for those conversions that might result in takings is a thinly veiled attempt to circumvent the established method for determining whether Tucker Act relief is available for claims arising out of takings pursuant to a federal statute. We reaffirm that a Tucker Act remedy exists unless there are unambiguous indications to the contrary.

Section 101, moreover, speaks only to appropriations under the Amendments themselves and not to relief available

14

under the Tucker Act, as evidenced by § 101's opening clause—"[n]otwithstanding any other provision of *this* Act" (emphasis added)—which refers to the 1983 Amendments. The section means simply that payments made pursuant to the Amendments, such as funding for scenic trails, markers, and similar purposes, see Amendments § 209(5)(C), 97 Stat. 49 (codified at 16 U. S. C. § 1249(c)(2)) (authorizing appropriations for the development and administration of certain National Scenic and National Historic Trails), are effective only "in such amounts as are provided in advance in appropriation Acts," a concept that mirrors Art. I, § 9, of the Constitution ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"). Payments for takings claims are not affected by this language, because such claims "arise" under the Fifth Amendment, see *First English Evangelical Lutheran Church*, 482 U. S., at 315–316. Payments for takings would be made "under" the Tucker Act, not the Trails Act, and would be drawn from the Judgment Fund, which is a separate appropriated account, see 31 U. S. C. § 1304(a) (1982 ed.). Section 101 does not manifest the type of clear and unmistakable congressional intent necessary to withdraw Tucker Act coverage.

Petitioners next assert that Congress' desire that the Amendments operate at "low cost," H. R. Rep., at 3, somehow indicates that Congress withdrew the Tucker Act remedy. There is no doubt that Congress meant to keep the costs of the Amendments to a minimum.[7] This intent, however, has little bearing on the Tucker Act question. We

---

[7] See H. R. Rep., at 2 (noting that the Committee "eliminated most of the items which could require future Federal expenditures"); S. Rep., at 3 (same); H. R. Rep., at 11 (reporting required funding for the bill to be "insignificant"); 129 Cong. Rec. 5219 (1983) (remarks of floor manager Rep. Seiberling) ("[T]he committee recommended a revised text which eliminated most of the items which would require future Federal expenditures. . . . Additional recommendations reflect continuing efforts to encourage the expansion of trail recreation opportunities across the Nation at a low cost").

have previously rejected the argument that a generalized desire to protect the public fisc is sufficient to withdraw relief under the Tucker Act. In the *Regional Rail Reorganization Act Cases,* we recognized that the Rail Act established "[m]aximum" funding authorizations, 419 U. S., at 127–128, but we nevertheless held that those limits were not an unambiguous repeal of the Tucker Act remedy. We reasoned that the maximum limits might "support the inference that Congress was so convinced that the huge sums provided would surely equal or exceed the required constitutional minimum that it never focused upon the possible need for a suit in the Court of Claims." *Id.,* at 128. In *Monsanto,* we stated that:

> "Congress in [the statute] did not address the liability of the Government to pay just compensation should a taking occur. Congress' failure specifically to mention or provide for recourse against the Government may reflect a congressional belief that use of data by [the Government] in the ways authorized by [the statute] effects no Fifth Amendment taking or it may reflect Congress' assumption that the general grant of jurisdiction under the Tucker Act would provide the necessary remedy for any taking that may occur. In any event, the failure cannot be construed to reflect an unambiguous intention to withdraw the Tucker Act remedy." 467 U. S., at 1018–1019.

Similar logic applies to the instant case. The statements made in Congress during the passage of the Trails Act Amendments might reflect merely the decision not to create a program of direct federal purchase,[8] construction, and

---

[8] We note that the ICC has construed § 8(d) as not providing federal power to condemn railroad rights-of-way for interim trail use. See *Rail Abandonments,* 2 I. C. C. 2d, at 596–598; see also *National Wildlife Federation* v. *ICC,* 271 U. S. App. D. C. 1, 4, n. 4, 6–9, 850 F. 2d. 694, 697, n. 4, 699–702 (1988); *Connecticut Trust for Historic Preservation* v. *ICC,*

maintenance of trails, and instead to allow state and local governments and private groups to establish and manage trails. The alternative chosen by Congress is less costly than a program of direct federal trail acquisition because, under any view of takings law, only some rail-to-trail conversions will amount to takings. Some rights-of-way are held in fee simple. See *National Wildlife Federation* v. *ICC*, 271 U. S. App. D. C. 1, 10, 850 F. 2d 694, 703 (1988). Others are held as easements that do not even as a matter of state law revert upon interim use as nature trails.[9] In addition, under § 8(d) the Federal Government neither incurs the costs of constructing and maintaining the trails nor assumes legal liability for the transfer or use of the right-of-way. In contrast, the costs of acquiring and administering national scenic and national historic trails are borne directly by the Federal Government. See n. 1, *supra*. Thus, the "low cost" language might reflect Congress' rejection of a more ambitious program of federally owned and managed trails, rather than withdrawal of a Tucker Act remedy. The language does not amount to the "unambiguous intention" required by our prior cases.[10]

---

841 F. 2d 479, 482–483 (CA2 1988); *Washington State Dept. of Game* v. *ICC*, 829 F. 2d 877, 879–882 (CA9 1987).

[9] Some state courts have held that trail use does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights. See *State by Washington Wildlife Preservation, Inc.* v. *State*, 329 N. W. 2d 543, 545–548 (Minn.), cert. denied, 463 U. S. 1209 (1983); *Reiger* v. *Penn Central Corp.*, No. 85–CA–11 (Ct. App. Greene County, Ohio, May 21, 1985).

[10] Petitioners also claim that a floor statement by Senator Domenici that "the Federal Government has acquired too much land from landowners using condemnation procedures that in essence short changed the property rights of the landowners," 129 Cong. Rec. 1607 (1983), means that Tucker Act relief is unavailable. We disagree. The Senator spoke in the context of praising the statute for "encourag[ing] cooperation" rather than resorting automatically to condemnation. *Ibid.* As administered by the ICC, the conversion process begins when a railroad *voluntarily* seeks a CITU or NITU; it then negotiates with a qualified trail operator to establish interim

In sum, petitioners' failure to make use of the available Tucker Act remedy renders their takings challenge to the ICC's order premature. We need not decide whether a taking occurred in this case.

## III

Petitioners also contend that the Amendments are not a valid exercise of congressional power under the Commerce Clause, Art. I, § 8, because the true purpose of § 8(d) is to prevent reversion of railroad rights-of-way to property owners after abandonment and to create recreational trails, rather than to preserve rail corridors for future railroad use. We evaluate this claim under the traditional rationality standard of review: we must defer to a congressional finding that a regulated activity affects interstate commerce "if there is any rational basis for such a finding," *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981), and we must ensure only that the means selected by Congress are "'reasonably adapted to the end permitted by the Constitution.'" *Ibid.* (quoting *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 262 (1964)); see also *Hodel* v. *Indiana*, 452 U. S. 314, 323–324 (1981). The Amendments clearly pass muster.

Two congressional purposes are evident. First, Congress intended to "encourage the development of additional trails" and to "assist recreation[al] users by providing opportunities for trail use on an interim basis." H. R. Rep., at 8, 9; S. Rep., at 9, 10 (same); see also 16 U. S. C. § 1241(a) (Trails Act "promote[s] the preservation of, public access to, travel within, and enjoyment and appreciation of the open-air, out-

___

trail use. The ICC does not set up trails on its own and has interpreted § 8(d) to exclude the type of condemnation power vested in the Secretaries of the Interior and Agriculture by 16 U. S. C. § 1246(g). See n. 8, *supra.* This limitation on ICC condemnation authority is not relevant to the question whether compensation under the Tucker Act is available for takings resulting from the conversions that do occur, and it certainly is not an unambiguous sign that Congress meant to withdraw Tucker Act relief.

door areas and historic resources of the Nation"). Second, Congress intended "to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." H. R. Rep., at 8; S. Rep., at 9; see also 16 U. S. C. § 1247(d). These are valid congressional objectives to which the Amendments are reasonably adapted.

Petitioners contend that the Amendments do not reasonably promote the latter purpose because the ICC cannot authorize trail use until it has found that the right-of-way at issue is not necessary for "present *or future* public convenience and necessity." 49 U. S. C. § 10903(a) (1982 ed.) (emphasis added). The ICC has explained that:

> "In every Trails Act case, we will already have found that the public convenience and necessity permit abandonment (or that regulatory approval is not required under 49 U. S. C. [§]10505)." 54 Fed. Reg. 8012, n. 3 (1989).

Thus, trail conversion is permitted only *after* the Commission determines that rail service will not be not needed in the foreseeable future. This, according to petitioners, reveals that the rail banking rationale is a sham. If Congress really wished to address the problem of shrinking trackage, it would not have left conversions to voluntary agreements between railroads and state and local agencies or private groups. Rather, petitioners suggest, Congress would have created a mandatory program administered directly by the ICC.

We note at the outset that even under petitioners' reading, the Amendments would still be a valid exercise of congressional power under the Commerce Clause because they are reasonably adapted to the goal of encouraging the development of additional recreational trails. There is no requirement that a law serve more than one legitimate purpose. Moreover, we are not at liberty under the rational basis standard of review to hold the Amendments invalid merely

because more Draconian measures—such as a program of mandatory conversions or a prohibition of *all* abandonments—might advance more completely the rail banking purpose. The process of legislating often involves tradeoffs, compromises, and imperfect solutions, and our ability to imagine ways of redesigning the statute to advance one of Congress' ends does not render it irrational. See, *e. g.*, *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 469 (1981). The history of congressional attempts to address the problem of rail abandonments, see *supra*, at 5–6, provides sufficient reason to defer to the legislative judgment that § 8(d) is an appropriate answer. Here, as in *Virginia Surface Mining & Reclamation Assn., Inc.*, "Congress considered the effectiveness of existing legislation and concluded that additional measures were necessary." 452 U. S., at 283.

Petitioners' argument that § 8(d) does not serve the rail banking purpose, moreover, is not well taken. That the ICC must certify that public convenience and necessity permit abandonment before granting a CITU or NITU does not indicate that the statute fails to promote its purpose of preserving rail corridors. Congress did not distinguish between short-term and long-term rail banking, nor did it require that the Commission develop a specific contingency plan for reactivation of a line before permitting conversion. To the contrary, Congress apparently believed that every line is a potentially valuable national asset that merits preservation even if no future rail use for it is currently foreseeable. Given the long tradition of congressional regulation of railroad abandonments, see, *e. g.*, *Colorado* v. *United States*, 271 U. S. 153 (1926), that is a judgment that Congress is entitled to make.

## IV

For the reasons stated, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUS-
TICE KENNEDY join, concurring.

Petitioners assert that the actions of the Interstate Com-
merce Commission (ICC or Commission) prevent them from
enjoying property rights secured by Vermont law and
thereby have effected a compensable taking. The Court of
Appeals for the Second Circuit determined that, no matter
what Vermont law might provide, the ICC's actions fore-
stalled petitioners from possessing the asserted reversionary
interest, and thus that no takings claim could arise. Today
the Court affirms the Second Circuit's judgment on quite dif-·
ferent grounds. I join the Court's opinion, but write sepa-
rately to express my view that state law determines what
property interest petitioners possess and that traditional
takings doctrine will determine whether the Government
must compensate petitioners for the burden imposed on any
property interest they possess.

As the Court acknowledges, *ante*, at 8–9, 15–16, state law
creates and defines the scope of the reversionary or other
real property interests affected by the ICC's actions
pursuant to § 208 of the National Trails System Act Amend-
ments of 1983, 16 U. S. C. § 1247(d). In determining
whether a taking has occurred, "we are mindful of the basic
axiom that '[p]roperty interests . . . are not created by the
Constitution. Rather, they are created and their dimensions
are defined by existing rules or understandings that stem
from an independent source such as state law.'" *Ruckels-
haus* v. *Monsanto Co.*, 467 U. S. 986, 1001 (1984), quoting
*Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S.
155, 161 (1980) (internal quotation omitted). Although origi-
nal federal grants of railway easements may influence certain
disputes over interests in land, see *Great Northern R. Co.* v.
*United States*, 315 U. S. 262 (1942); *Idaho* v. *Oregon Short
Line R. Co.*, 617 F. Supp. 207 (Idaho 1985), no such federal
role is present in this case. Rather, the parties sharply dis-
pute what interest, according to Vermont law, the State of

Vermont acquired from the Rutland Railway Corporation and, correspondingly, whether petitioners possess the property interest that they claim has been taken. See Brief for Petitioners 15, and n. 14; Brief for Respondents State of Vermont et al. 22–25; Reply Brief for Petitioners 2–4. Similar reference to state law has guided other courts seeking to determine whether a railway right of way lapsed upon the conversion to trail use. Compare *State by Washington Wildlife Preservation, Inc.* v. *State*, 329 N. W. 2d 543, 545–548 (Minn.) (trail use within original interest, thus reversionary rights have not matured), cert. denied, 463 U. S. 1209 (1983), with *Lawson* v. *State*, 107 Wash. 2d 444, 730 P. 2d 1308 (1986) (change in use would give effect to reversionary interests); *McKinley* v. *Waterloo R. Co.*, 368 N. W. 2d 131, 133–136 (Iowa 1985) (lack of railway use triggered period leading to reversion); *Schnabel* v. *County of DuPage*, 101 Ill. App. 3d 553, 428 N. E. 2d 671 (1981) (easement lapsed). Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim. See *Ruckelshaus* v. *Monsanto Co.*, *supra*, at 1001–1004. We do not attempt to resolve that issue.

It is also clear that the Interstate Commerce Act, and the ICC's actions pursuant to it, pre-empt the operation and effect of certain state laws that "conflict with or interfere with federal authority over the same activity." *Chicago & North Western Transp. Co.* v. *Kalo Brick & Tile Co.*, 450 U. S. 311, 319 (1981); see *id.*, at 318–319. States may not impose obligations upon carriers at odds with those governed through the ICC's "exclusive" and "plenary authority to regulate . . . rail carriers' cessations of service on their lines." *Id.*, at 323; see *id.*, at 324–327. A State may again exercise its regulatory powers once the ICC authorizes a carrier's abandonment of service, and, thus, unless the Commission attaches postabandonment conditions to the abandonment certificate,

"brings [the Commission's] regulatory mission to an end." *Hayfield Northern R. Co.* v. *Chicago & North Western Transp. Co.*, 467 U. S. 622, 633 (1984). As the Vermont Supreme Court recognized, state courts cannot enforce or give effect to asserted reversionary interests when enforcement would interfere with the Commission's administration of the Interstate Commerce Act. See *Trustees of Diocese of Vermont* v. *State*, 145 Vt. 510, 496 A. 2d 151 (1985). These results are simply routine and well-established consequences of the Supremacy Clause, U. S. Const., Art. VI, cl. 2.

The scope of the Commission's authority to regulate abandonments, thereby delimiting the ambit of federal power, is an issue quite distinct from whether the Commission's exercise of power over matters within its jurisdiction effected a taking of petitioners' property. Cf. *Kaiser Aetna* v. *United States*, 444 U. S. 164, 174 (1979) ("[T]here is no question but that Congress could assure the public a free right of access . . . . Whether a statute or regulation that went so far amounted to a 'taking,' however, is an entirely separate question"). Although the Commission's actions may pre-empt the operation and effect of certain state laws, those actions do not displace state law as the traditional source of the real property interests. See *Ruckelshaus* v. *Monsanto Co.*, *supra*, at 1003–1004, 1012 (state law creates property right in trade secrets for purposes of Fifth Amendment, and regulatory regime does not pre-empt state property law). The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights. See *National Wildlife Federation* v. *ICC*, 271 U. S. App. D. C. 1, 11–12, and n. 16, 850 F. 2d 694, 704–705, and n. 16 (1988). Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. See *Ruckels-*

*haus* v. *Monsanto Co.*, 467 U. S., at 1012 ("If Congress can 'pre-empt' state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. [A] sovereign, 'by *ipse dixit*, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent'"), quoting *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S., at 164.

The Court of Appeals for the Second Circuit adopted just this unjustified interpretation of the effect of the ICC's exercise of federal power. The court concluded that even if petitioners held the reversionary interest they claim, no taking occurred because "no reversionary interest can or would vest" until the ICC determines that abandonment is appropriate. See 853 F. 2d 145, 151 (1988). This view conflates the scope of the ICC's power with the existence of a compensable taking and threatens to read the Just Compensation Clause out of the Constitution. The ICC may possess the power to postpone enjoyment of reversionary interests, but the Fifth Amendment and well-established doctrine indicate that in certain circumstances the Government must compensate owners of those property interests when it exercises that power. See *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 314–315 (1987) (The Taking Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power," and the Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking"). Nothing in the Court's opinion disavows these principles. The Court's conclusion that § 8(d) authorizes rails-to-trails conversions that amount to takings, *ante*, at 13, and its conclusion that "under any view of takings law, only some rail-to-trail conversions will amount to takings," *ante*, at 16, are inconsistent with the Second Circuit's view. Indeed, if the Second Circuit's

24

approach were adopted, discussion of the availability of the Tucker Act remedy would be unnecessary. Even the federal respondents acknowledge that the existence of a taking will rest upon the nature of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest. See Brief for Federal Respondents 23–24.

Well-established principles will govern analysis of whether the burden the ICC's actions impose upon state-defined real property interests amounts to a compensable taking. We recently concluded in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825, 831–832 (1987), that a taking would occur if the Government appropriated a public easement. See also *Kaiser Aetna, supra*, at 179–180 ("[T]he 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation") (footnote omitted). In such a case, a "permanent physical occupation" of the underlying property "has occurred . . . where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Nollan, supra*, at 832; see also, *Kaiser Aetna, supra*, at 180 ("[E]ven if the Government physically invades only an easement in property, it must nonetheless pay just compensation"). The Government's appropriation of other, lesser servitudes may also impose a burden requiring payment of just compensation. See *United States* v. *Causby*, 328 U. S. 256 (1946); *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 260 U. S. 327 (1922). And the Court recently concluded that the Government's burdening of property for a distinct period, short of a permanent taking, may nevertheless mandate compensation. See *First English Evangelical Lutheran Church, supra*, at 318–319. Of course, a party may gain the benefit of these principles only after establishing possession of a property interest

that has been burdened.   As today's decision indicates, petitioners and persons similarly situated will have ample opportunity to make that showing.

With this understanding, and for the reasons set forth in the Court's opinion, I agree that the judgment below should be affirmed.