The Cheney Railroad Company ("Cheney") deeded a railroad corridor to Blount County ("the County") and the City of Oneonta ("the City"). The corridor is approximately 50 miles long and 100 feet wide and is situated in Jefferson, Blount, and Etowah Counties.[1] The corridor was transferred as a recreational trail, pursuant to § 10-5-2.1, Ala. Code 1975, which states:
 "Any railroad is hereby authorized to transfer all rights, title, and interests to any abandoned right-of-way or portion thereof for public road and bridge use to the State Department of Transportation *Page 237 
or for any purpose to any county commission in any county or any municipality in which said right-of-way or portion thereof is located."
This railroad corridor is comprised of numerous easements granted to a railroad predecessor of Cheney by landowners whose property adjoined the corridor.
The plaintiffs are a group of landowners who presently own the property that adjoins the corridor and who are successors in title to those landowners who granted the railroad easements ("the landowners").[2]
They sued the County and the City[3] for a declaratory judgment holding that Cheney had abandoned the railroad easements and that the abandonment had caused the easements to revert to the landowners as successors in title. The landowners further asserted in a subsequent pleading that § 10-5-2.1 is unconstitutional as a taking of private property without just compensation.[4]
All parties filed motions for summary judgment. After hearing arguments on the motions, the trial court entered a summary judgment in favor of the defendants. The landowners appeal; we reverse and remand.
 I. Background
In 1985, the Legislature adopted Act No. 85-937, Ala. Acts 1985, now codified as § 10-5-2.1. In doing so, the Legislature recognized a national trend toward allowing public use of former railbeds and the policy of the United States favoring that trend, as expressed in the National Trails System Act, codified at 16 U.S.C. § 1241 et seq. ("the Rails-to-Trails Act"). The United States Supreme Court explained this policy in Preseault v. ICC, 494 U.S. 1 (1990):
 "The statute at issue in this case, the National Trails System Act Amendments of 1983 (Amendments), Pub.L. 98-11, 97 Stat. 48, to the National Trails System Act (Trails Act), Pub.L. 90-543, 82 Stat. 919
(codified, as amended, at 16 U.S.C. § 1241 et seq.), is the culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails. In 1920, the Nation's railway system reached its peak of 272,000 miles; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century. Concerned about the loss of trackage, Congress included in the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub.L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. § 10906 (1982 ed.), several provisions aimed at promoting the conversion of abandoned lines to trails. Section 809(a) of the 4-R Act required the Secretary of Transportation to prepare a report on alternative uses for abandoned railroad rights-of-way. Section 809(b) authorized the Secretary of the Interior to encourage conversion *Page 238 
of abandoned rights-of-way to recreational and conservational uses through financial, educational, and technical assistance to local, state and federal agencies. . . .
 "By 1983, Congress recognized that these measures `ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes.' H.R. Rep. No. 98-28, p. 8 (1983) (H.R. Rep.); S. Rep. No. 98-1, p. 9 (1983) (S. Rep.) (same) [U.S. Code Cong. Admin. News 1983, pp. 112, 119]. Congress enacted the Amendments to the Trails Act, which authorize the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails. Section 8(d) provides that a railroad wishing to cease operations along a particular route may negotiate with a State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to ICC-imposed terms and conditions; if no agreement is reached, the railroad may abandon the line entirely and liquidate its interest."
494 U.S. at 5-7 (footnotes omitted). The question before the Supreme Court in Preseault was "the constitutionality of a federal `rails-to-trails' statute under which unused railroad rights-of-way are converted into recreational trails notwithstanding whatever reversionary property interests may exist under state law." Id. at 4. The Supreme Court upheld the Rails-to-Trails Act against the constitutional challenge.
In essence, the Rails-to-Trails Act allows a railroad that wishes to stop operating a certain line to negotiate with a state, a municipality, or some private group for the railroad right-of-way to be converted into a public trail. 16 U.S.C. § 1247 (d).[5] The primary purposes of the Rails-to-Trails Act are to increase the number of recreational trails in this country and to preserve railroad rights-of-way for potential future use. Of particular interest to us in this case is the provision in § 1247(d) stating that the interim use of railroad rights-of-way as public trails while the rights-of-way are "subject to restoration or *Page 239 
reconstruction for railroad purposes . . . shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."
The Supreme Court discussed in Preseault the problem presented by that provision:
 "This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests, subject of course to the [Interstate Commerce Commission's] `exclusive and plenary' jurisdiction to regulate abandonments and to impose conditions affecting postabandonment use of the property. By deeming interim trail use to be like discontinuance rather than abandonment, see n. 3, supra,[6]
Congress prevented property interests from reverting under state law:
 "`The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trail use will be considered prior to abandonment.' H.R. Rep., at 8-9 [U.S. Code Cong. Admin. News 1983, pp. 119, 120].
"See S. Rep., at 9 (same)."
494 U.S. at 8-9 (citations omitted). As one court has stated, "[t]he effect of this provision is to prevent property interests from reverting to adjacent land owners under state law, thus creating the potential that private property might be taken for public use." Hash v. United States, (No. CV-99-324-S-MHW, July 7, 2000) (D.Idaho 2000) (unpublished).
This discussion of federal legislation provides helpful background. However, as discussed below, the disposition of this case is governed entirely by Alabama law.
 II. Preconveyance Abandonment of the Easements
The landowners argue that Cheney had abandoned the easements composing the railroad corridor before Cheney attempted to convey the property to the County and the City on June 5, 1997, and that the abandonment triggered their reversionary interests. The evidence submitted to the *Page 240 
trial court regarding these easements indicates that during the late 1800s representatives of the Oneonta Attalla Railroad and the Birmingham Mineral Railroad Company purchased easements over which to operate a railroad through Etowah, Blount, and Jefferson Counties and that they purchased those easements from landowners who were the predecessors in title to the plaintiffs in this case. The deeds granting those easements to the railroads expressly transferred either "right[s] of way for [a] railroad" or "right[s] of way" for railroad purposes. Those railroad purposes can be understood from language in the deeds, such as language granting certain land for the "main track," language indicating an agreement that the reservation of mineral rights would "in no way impair the road bed of said main track," and language reserving the right to cross "the right of way herein granted and also said main track . . . provided such crossings be built and kept in such repair as shall not endanger the operation of trains." Some of the deeds stated that the easements were to exist only "so long as said right[s] of way [are] used for the purposes herein granted, it being understood that should said right of way be diverted from such purposes, then it shall revert to the grantor herein." After acquiring the easements, the Oneonta Attalla Railroad and the Birmingham Mineral Railroad Company conveyed them in 1900 and 1904, respectively, to the Louisville and Nashville Railroad Company ("L N"). In 1982, L N merged with a company now known as CSX Transportation, Inc. In 1989, CSX conveyed the easements and other interests to Cheney.
Cheney operated a railroad along the railroad corridor for approximately six years. In 1995, upon the death of Alan Cheney, Sr., the company decided to begin what a news report described as "the process of converting the railroad company assets for his surviving family." On May 31, 1996, Cheney sold all the rails, crossties, and other track materials located on the railroad corridor and directed the buyer to remove those materials from the corridor. The last train ran on August 23, 1996. During the autumn and winter of 1996-97, Cheney attempted to sell the railroad corridor for what the landowners describe as "nonrailroad uses," but its efforts were unsuccessful. Thereafter, on June 5, 1997, Cheney executed a deed purporting to quitclaim to the City and the County, pursuant to § 10-5-2.1, whatever rights it had remaining in the easements composing the railroad corridor, except that in the quitclaim deed Cheney retained its interest in a small portion of the corridor known as the Graystone Branch and in "all crushed stone ballast material" remaining in the corridor. On September 3, 1998, Cheney sold the ballast material. The landowners contend that Cheney's actions related here require a finding that Cheney abandoned the easements composing the railroad corridor and did so at some point before it executed the June 5, 1997, deed.
The trial court, however, concluded that the landowners had failed to prove Cheney had abandoned the railroad corridor. The court stated:
 "The Plaintiffs have the burden of proving their contention that Cheney abandoned its railway prior to its conveyance to Blount County and the City of Oneonta, and thus triggered Plaintiffs' reversionary rights. The Court finds that the Plaintiffs have failed to meet their burden of proof. The payment of property taxes,[7] the sale of the *Page 241 
rails and crossties, the giving of a deed to Blount County and the City of Oneonta, the reservation of the ballast material, the reservation of the Graystone Branch, and the express reference in the deed to § 10-5-2.1
are acts on the part of Cheney which are all inconsistent with the intent to abandon said railway. The evidence does not demonstrate an abandonment of the easements by Cheney Railroad Company, Inc., which would trigger Plaintiffs' reversionary interest."
We look to state law to determine whether Cheney had abandoned the easements. Preseault, 494 U.S. at 8.[8] As a general rule, one holding an easement cannot change the character of that easement, Blalockv. Conzelman, 751 So.2d 2 (Ala. 1999), or "enlarge upon [that] easement for other purposes." Roberts v. Monroe, 261 Ala. 569, 577, 75 So.2d 492,499 (1954). Specifically as to a railroad easement, this Court has held that such an easement was limited in use to railroad purposes.Nashville, C. St. L. Ry. v. Karthaus, 150 Ala. 633, 43 So. 791 (1907);West v. Louisville N. R.R., 137 Ala. 568, 34 So. 852 (1903). An easement granted for a specific purpose is deemed abandoned when its owner "`"by his own act renders the use of the easement impossible, or himself obstructs it in a manner inconsistent with its further enjoyment."'" Byrd Cos. v. Smith, 591 So.2d 844, 847 (Ala. 1991) (quoting Polyzois v. Resnick, 123 Neb. 663, 668, 243 N.W. 864, 866 (1932) (quoting treatise)). See also Tatum v. Green, 535 So.2d 87, 88 (Ala. 1988) ("[A]n easement given for a specific purpose terminates as soon as the purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment.").
After reviewing the evidence in this case, we conclude that Cheney had abandoned the easements that had composed the railroad corridor. By selling the rails, crossties, and track material, Cheney rendered impossible the use of the easements as a railroad right-of-way or for railroad purposes. This action, together with Cheney's attempt to sell its interest in the easements and its eventual unconditional conveyance of the vast majority of the railroad corridor to the County and the City,[9] convince us that Cheney, before it made that conveyance, had intended to abandon, and did abandon, the easements, which initially had been acquired for railroad purposes.
Other jurisdictions that have considered a similar question of abandonment of railroad easements have reached similar conclusions. Some jurisdictions have relied upon the railroad's actions in ceasing operations and removing the physical objects *Page 242 
that made it possible for trains to travel, e.g., the rails, crossties, and railbed materials. See Becker v. Surface Transp. Bd.,132 F.3d 60 (D.C. Cir. 1997) (railroad that had ceased operations, canceled its tariffs, removed rails and ties from the line, and opposed any extension of negotiations for use of rail line as public trail had exhibited conduct consistent with intent to abandon);Glosemeyer v. United States, 45 Fed. Cl. 771 (2000) (applying Missouri law) (railroad's application for certificate of abandonment, together with its removing everything necessary for the operation of a rail line, including the rails, ties, and railbed, constituted clear evidence of abandonment); Consolidated Rail Corp. v. Lewellen,682 N.E.2d 779, 784 (Ind. 1997) (pursuant to 1987 Indiana statute, issuance of certificate of abandonment and removal from right-of-way of rails, switches, ties, and other railroad "facilities" constitute sufficient evidence of railroad's intent to abandon). Other jurisdictions have relied on the railroad company's intent to use the easements for a purpose other than that of operating a railroad. See Lawson v. State,107 Wn.2d 444, 452, 730 P.2d 1308, 1313 (1986) (where deed conveyed right-of-way for railroad purposes only, change in use from "rails to trails" constituted abandonment); Preseault v. United States, 100 F.3d 1525
(D.C. Cir. 1996) (when easements were granted to railroad by plaintiffs' predecessors in title for the transportation of goods and persons via railroad, use of easements for recreational hiking and biking trails did not fall within scope of easement); National Wildlife Fed'n v. ICC,850 F.2d 694 (D.C. Cir. 1988) (rejecting argument that rails-to-trails conversions will never constitute a taking and remanding for further consideration); Eldridge v. City of Greenwood, 331 S.C. 398, 503 S.E.2d 191
(S.C.App. 1998) (conversion from railroad use to public-roadway use extinguished easement obtained by statutory presumption of grant). See also Schnabel v. County of DuPage, 101 Ill. App.3d 553, 428 N.E.2d 671,57 Ill. Dec. 121 (1981); Pollnow v. State Dep't of Natural Resources,88 Wis.2d 350, 276 N.W.2d 738 (1979). But see Chevy Chase Land Co. v.United States, 355 Md. 110, 733 A.2d 1055 (1999) (use of right-of-way as recreational trail fell within scope of easement); Barney v. BurlingtonN. R.R., 490 N.W.2d 726 (S.D. 1992), cert. denied, 507 U.S. 914 (1993) (recreational-trail use of railroad easement granted by federal statute comes within definition of "public highway"); Rieger v. Penn CentralCorp., (No. 85-CA-11, May 21, 1985) (Ohio App. 1985) (unpublished) (general purpose of trail, that of public travel, is within scope of prescriptive railroad easement); Washington Wildlife Preservation, Inc.v. State, 329 N.W.2d 543 (Minn.), cert. denied, 463 U.S. 1209 (1983) (deeds did not limit use to railroad purposes).
The landowners correctly assert that proof that Cheney had abandoned the easements ends our inquiry in this case. The facts support a conclusion that the subject easements had been abandoned pursuant to Alabama law, and thus extinguished. Unlike the federal Rails-to-Trails Act, 16 U.S.C. § 1241 et seq., the Alabama statute, § 10-5-2.1, wholly fails to create the distinction between discontinuance and abandonment by reason of a provision for interim use for other than a railroad purpose with express provision for future reactivation of rail service.
Section 10-5-2.1 purports to allow a railroad to transfer "all rights, title, and interests." This is the language generally used in a quitclaim deed. Dickinson v. Moore, 468 So.2d 136 (Ala. 1985). "A quitclaim deed can convey nothing more than what the grantor actually owns." Benedict v. Little, 288 Ala. 638, 643, 264 So.2d 491, 494 *Page 243 
(1972). Under the circumstances of this case, Cheney's quitclaim deed conveyed nothing to the County and the City because before it executed that deed Cheney had already abandoned any rights, title, and interests it had had in the easements. In Benedict, which also involved the question whether a railroad easement had been abandoned, this Court stated, "[T]he quitclaim from L N to appellees conveyed nothing because L N had nothing to convey after abandoning the right of way and removing the rails and crossties." Id. See also Consolidated RailCorp. v. Lewellen, supra, in which the Supreme Court of Indiana stated that the Rails-to-Trails Act "does not provide for the seizure of railway rights-of-way for interim trail use after railroads already have abandoned the rights-of-way." 682 N.E.2d at 784 n. 10.
Moreover, we cannot conceive of any circumstances under which § 10-5-2.1 could have any field of operation in a case such as this. If a railroad has not abandoned its easements, then it is not authorized to convey them pursuant to § 10-5-2.1, because the statute purports to allow only the transfer of an "abandoned" right-of-way. If a railroad has abandoned its easements, then the statute purports to allow the transfer of whatever rights the railroad owns in a situation where it no longer owns anything. We cannot read into § 10-5-2.1 an intent to create a right where none existed before, especially given the fact that in describing what interest a grantor might have the statute refers to "all rights, title, and interests." In the face of a challenge by landowners to whom title had reverted when the railroad abandoned its easements, we simply cannot hold the statute effective to convey a property interest. Under the facts here presented, we must conclude that the statute, as written, does not achieve the purpose for which it was enacted, because the unconditional conveyances it invites would defeat the grantors' continuing interest in the easements made the subject of an attempted transfer.
We therefore pretermit any consideration of the landowners' argument that § 10-5-2.1 violates the United States Constitution and the Alabama Constitution as an unlawful taking of private property without just compensation. The landowners are entitled to the continued enjoyment of their property at issue in this case in fee simple absolute, without the burden of railroad easements.
 III. Conclusion
Because we conclude that Cheney had abandoned the easements composing the railroad corridor, we reverse the summary judgment entered in favor of the County and the City and remand the cause for an order or proceedings consistent with this opinion.
REVERSED AND REMANDED.
Hooper, C.J., and Houston, See, Brown, Johnstone, and England, JJ., concur.
Maddox, J., concurs in the result.
[1] The railroad corridor extends from near Pinson in Jefferson County through Remlap and Oneonta in Blount County to near Altoona in Etowah County. It is described as extending from what is now milepost 396.38 in Jefferson County to milepost 443.54 in Etowah County.
[2] The named plaintiffs are William Chatham, Al Davenport, J.D. Nix, Edna V. Gunter, Jim Loftis, Ed Cowden, and Herbert Spitzer. Intervenor plaintiffs are Dave Ingram, the Jefferson County Board of Education, and the First Presbyterian Church of Gadsden. The trial court certified a class of plaintiffs described as "all persons who own or claim to own an interest in the property adjacent to or consisting of any portion of the railroad corridor, excluding the Defendants Blount County, Alabama, and the City of Oneonta."
[3] The Birmingham Water Works Board was an intervenor defendant, but it is not a party to this appeal.
[4] The record indicates that the landowners notified the attorney general of their challenge to the constitutionality of § 10-5-2.1, pursuant to § 6-6-227, Ala. Code 1975, and Rule 44, Ala.R.App.P. SeeEx parte Northport Health Serv., Inc., 682 So.2d 52 (Ala. 1996).
[5] 16 U.S.C. § 1247(d) states:
 "The Secretary of Transportation, the Chairman of the Interstate Commerce Commission, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 [ 45 U.S.C. § 801 et seq.], shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Commission shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use."
[6] In note 3, the Supreme Court had stated:
 "There is an important distinction in the Interstate Commerce Act between `abandonment' of a rail line and `discontinuance' of service. See 49 U.S.C. § 10903
(1982 ed.). Once a carrier `abandons' a rail line pursuant to authority granted by the Interstate Commerce Commission, the line is no longer part of the national transportation system, and although the Commission is empowered to impose conditions on abandonments, see, e.g., 49 U.S.C. § 10905(f)(4), 10906 (1982 ed.), as a general proposition ICC jurisdiction terminates. In contrast, `discontinuance' authority allows a railroad to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future."
Preseault, 494 U.S. at 5-6 n. 3 (citation omitted).
[7] The trial court's order states that Cheney paid "the ad valorem taxes on said corridor through October 1, 1997."
[8] The federal statute, 16 U.S.C. § 1247(d), quoted in note 5 of this opinion and discussed in Preseault, does not apply to this proceeding. The landowners say that the federal Rails-to-Trails Act does not apply here because Cheney had previously elected to be exempt from the provisions of Title 49, Subtitle IV, of the United States Code, citing Cheney Railroad Co. v. Railroad Retirement Board, 50 F.3d 1071
(D.C. Cir. 1995) (stating that Cheney had elected to be exempt under49 U.S.C. § 10910(g)(1), now recodified at § 10907(g)(1)). Accordingly, the landowners say, the Surface Transportation Board's typical regulatory control over whether a railroad has been legally abandoned did not apply in this case, citing Cheney Railroad Co. —Feeder Line Acquisition (No. 31012, March 4, 1994) (I.C.C. 1994) (stating that a railroad that has invoked § 10907(g)(1) is exempt from abandonment regulation). The County and the City do not challenge the inapplicability of the federal statute, and all parties in this case have proceeded solely pursuant to § 10-5-2.1.
[9] We do not consider the fact that by the quitclaim deed Cheney retained its interest in the Graystone Branch and in the ballast material to be significant for purposes of this issue.