United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 4, 1999 Decided October 22, 1999 

 No. 99-1054

 Kevin Jost, et al., 
 Petitioners

 v.

 Surface Transportation Board and 
 United States of America, 
 Respondents

 Central Kansas Railway, Limited Liability Company, 
 Intervenor

 On Petition for Review of an Order of the 
 Surface Transportation Board

 Nels J. Ackerson argued the cause and filed the briefs for 
petitioners.

 Troy W. Garris, Attorney, Surface Transportation Board, 
argued the cause for respondents. With him on the brief 

were Henri F. Rush, General Counsel, and Ellen D. Hanson, 
Deputy General Counsel, and M. Alice Thurston, Attorney, 
United States Department of Justice.

 Thomas F. McFarland, Jr. was on the brief for intervenor.

 Before: Edwards, Chief Judge, Wald and Williams, 
Circuit Judges.
 
 Opinion for the Court filed by Circuit Judge Wald.

 Wald, Circuit Judge: Kevin Jost petitions for review of an 
order of the Surface Transportation Board ("the Board") 
declining to reopen a proceeding wherein the Board issued a 
notice of interim trail use ("NITU") for a railroad line former-
ly operated by the Central Kansas Railway ("CKR").1 Jost 
sought to reopen the proceeding on the grounds that, as a 
result of right-of-way sales by CKR, CKR's notice of exemp-
tion was void for misleading statements, rail banking and 
interim trail use were not possible, and CKR had abandoned 
the line. Jost also challenged the Board's refusal to review 
the financial fitness of the Central Kansas Conservancy 
("CKC" or "the Conservancy"), the trail sponsor that ac-
quired the line from CKR.

 We uphold the Board's decision not to review the fitness of 
the Conservancy to be a trail sponsor. However, we find that 
the Board has not adequately explained why Jost's evidence 
concerning the right-of-way sales did not require reopening 
the proceeding. Accordingly, we grant the petition for review 
and remand to the Board for further proceedings.

 I. Background

 As part of its jurisdiction over the common carrier respon-
sibilities of railroads, the Surface Transportation Board must 
approve the abandonment of a railroad line.2 Pursuant to a 
__________
 1 Jost's petition is joined by Alvin Kroupa, Allen Schlehuber, and 
the Citizens Association of Marion and McPherson Counties. For 
convenience, we will refer to petitioners simply as "Jost."

 2 Once abandonment occurs, "as a general proposition [the agen-
cy's] jurisdiction terminates." Preseault v. ICC, 494 U.S. 1, 5-6 n.3 
(1990).

statutory mandate, the Board has established an abbreviated 
process for abandonment of "out-of-service" lines.3 See 49 
U.S.C. s 10502 (Supp. III 1998); 49 C.F.R. s 1152.50 (1998). 
When a railroad files a verified "notice of exemption" stating 
it wishes to abandon an out-of-service line, the Board pub-
lishes a notice in the Federal Register which states that the 
railroad will be authorized to abandon the line in thirty days, 
unless the Board stays the exemption pursuant to a petition.4 
The notice also states that the exemption is void ab initio if 
the railroad's notice contains false or misleading information. 
See 49 C.F.R. s 1152.50(d)(3).

 At this point, the "rails-to-trails" program established un-
der the Trails Act, 16 U.S.C. s 1247(d), may come into play. 
The Trails Act authorizes the Board "to preserve for possible 
future railroad use rights-of-way not currently in service and 
to allow interim use of the land as recreation trails." Pre-
seault v. ICC, 494 U.S. 1, 6 (1990). Thus, the Trails Act has 
two goals, to preserve railroad rights-of-way and to encourage 
the creation of new recreation trails. See Preseault, 494 U.S. 
at 17-18.

 The Trails Act comes into play if, while the exemption is 
pending, a private organization files a "statement of willing-
ness" with the Board. The statement of willingness is an 
indication that the private organization (the "trail sponsor") is 
willing to take over management of and financial responsibili-
ty for the right-of-way, for the purposes of "rail banking" the 
line and establishing a trail on the right-of-way.5 If the 

__________
 3 A line is considered "out-of-service" if "no local traffic has 
moved over the line for at least 2 years and any overhead [i.e., 
through] traffic on the line can be rerouted over other lines" and no 
complaints about reduced rail service are pending or have been 
decided adverse to the railroad in the prior two years. 49 C.F.R. 
s 1152.50(b) (1998).

 4 Once the exemption becomes effective, the railroad is authorized 
to abandon the line. Under current regulations, the railroad must 
file a notice with the Board to consummate abandonment. See 49 
C.F.R. ss 1152.50(e), 1152.29(e)(2).

 5 "Rail banking" refers to the preservation of the right-of-way for 
possible future reinstitution of rail service. In addition to private 

railroad indicates its willingness to negotiate transfer of the 
line to the trail sponsor, then the Board will issue a notice of 
interim trail use ("NITU"). Under the NITU, the authoriza-
tion to abandon the line is stayed for a set period of time and 
the railroad is instead authorized to transfer the line for rail 
banking and interim trail use. If the parties' negotiations are 
successful, then the line is conveyed for interim trail use and 
possible future rail service. If the negotiations are unsuc-
cessful, then the railroad's exemption takes effect, and the 
line may be abandoned. Whether the negotiations over inter-
im trail use are successful or not, the Board need not reopen 
the proceeding once the NITU is issued.6

 In February 1996, the Central Kansas Railway sought to 
abandon a 33.4 mile rail line that it owned largely as ease-
ments over land belonging to others. CKR filed a notice of 
exemption with the Board, indicating that the line qualified as 
"out-of-service." The Board published a notice in the Federal 
Register stating that the exemption would be effective April 
12, 1996, unless the Board took further action. Central 
Kansas Ry., LLC--Abandonment Exemption--in Marion & 
McPherson Counties, KS, 61 Fed. Reg. 10,428, 10,429 (1996). 
The notice also states that the exemption would be void ab 
initio if CKR's notice contained false or misleading informa-
tion. Id.

 On April 9, 1996, CKR indicated to the Board that it had 
not abandoned the line and was willing to negotiate rail 
banking-interim trail use with an entity (Jennings & Co.) that 
had filed a statement of willingness to assume responsibility 
for the line. On April 12, 1996, the Board issued a notice of 
interim trail use and stayed the exemption for six months. 
The Board subsequently granted two additional extensions of 
time for the parties to negotiate rail banking-interim trail use. 
In June 1997, the Central Kansas Conservancy also filed a 

__________
organizations, state and local governments may also serve as trail 
sponsors. See 16 U.S.C. s 1247(d) (Supp. III 1998).

 6 However, on request of the parties, the Board will reopen the 
proceeding to grant further stays of the exemption to allow the 
parties more time for negotiations.

statement of willingness and requested a NITU. On June 12, 
1997, in its final action in this proceeding (other than the 
denial of the petition to reopen), the Board decided to issue a 
NITU and to postpone the effective date of the exemption 
until December 13, 1997. On September 19, 1997, pursuant 
to this NITU, the railroad conveyed the 33.4 mile line to the 
Conservancy for rail banking-interim trail use.

 On September 25, 1997, Jost, who owns land over which the 
line passes, filed a petition to reopen the abandonment pro-
ceeding on the grounds of material error and changed circum-
stances. Jost stated that both before and after filing its 
notice of exemption, CKR had conveyed portions of the right-
of-way, which rendered the line unsuitable for rail banking, 
and therefore for interim trail use. Jost argued that CKR's 
failure to disclose these sales caused the Board to erroneously 
issue a NITU. Jost also stated that CKR's conveyance of 
portions of the right-of-way, together with the lack of service 
on the line and the removal of rails, ties, and ballast, showed 
that CKR had consummated abandonment of the line. Final-
ly, Jost argued that changed circumstances, i.e., recent ex-
pressions of opposition to interim trail use by local govern-
ments, indicated that the Conservancy would be unable to 
meet its financial obligations for trail management.

 CKR responded to Jost's filings by stating that, although it 
had conveyed back some right-of-way along the line, it had 
retained sufficient right-of-way in all sales to allow for rail 
banking-interim trail use.7 Since the right-of-way sales did 
not impact rail banking or interim trail use, CKR argued it 
was not misleading to omit them.

__________
 7 The pre-sale right-of-way width was from 100-300 feet. The 
post-sale right-of-way width, according to CKR, was from 50-230 
feet. Right-of-way as little as 30 feet wide has been found to be 
sufficient for safe rail operations. See Boston & Maine Corp. & 
Springfield Terminal Ry. Corp.--Abandonment & Discontinuance 
of Service in Hartford County, CT in the Matter of a Request to Set 
Terms & Conditions, (Docket No. AB-32) (Sub.-No. 43) (Aug. 9. 
1991) (citing examples of 30-, 30- and 50-foot wide rights-of-way, 
but noting that question is highly fact specific). Thus, CKR con-
tends it only sold "excess" right-of-way.

 Jost responded by arguing that CKR had not simply con-
veyed "excess" right-of-way. Jost presented affidavits stat-
ing that, in three places, CKR had sold the entire, or "full-
width," right-of-way, breaking up the continuity of the line. 
CKR replied that the deeds in question were facially ambigu-
ous, and that it believed it had only conveyed excess right-of-
way.8

 The Board denied Jost's petition to reopen the abandon-
ment proceeding. The Board concluded that CKR's discon-
tinuance of service and removal of rails, ties and ballast did 
not consummate abandonment, particularly in light of CKR's 
ongoing negotiations over rail banking-interim trail use. 
Central Kansas Ry., LLC--Abandonment Exemption--in 
Marion & McPherson Counties, KS, (Docket No. AB-406) 
(Sub.-No. 6X) (Dec. 19, 1998) ("CKR--Abandonment Exemp-
tion"), slip op. at 3 (citing Birt v. STB, 90 F.3d 580 (D.C. Cir. 
1996)). The Board also found that Jost had not made a 
specific showing that the Conservancy would be unable to 
meet its financial obligations, and therefore the Board would 
not reopen the proceeding to examine the Conservancy's 
financial capacity.

 Finally, the Board stated:

 CKR has refuted these allegations [that the right-of-way 
 sales made interim trail use and rail banking impossible] 
 by submitting a verified statement specifically stating 
 that a sufficient width of right-of-way was conveyed to 
 CKC in all instances to permit trail use and to permit rail 
 service to be reinstituted for the entire length of the 
 right-of-way should there be an occasion for reestablish-
 ment of such rail service in the future. Moreover, while 
 all of the parties' filings will be accepted into the record, 
 
__________
 8 The description of property to be conveyed in each case was a 
map which contained both a written description and a yellow-shaded 
area indicating what was to be conveyed. However, the written 
description was inconsistent with the amount of right-of-way within 
the yellow-shaded area. CKR submitted affidavits that its intent 
was to sell only the amount indicated within the yellow-shaded area, 
and not the entire amount of right-of-way in the written description.

 we will not attempt to resolve all of the property issues 
 that these filings raise. State courts appear to be the 
 proper place for parties to resolve property disputes 
 about the parties' expectations and how much property 
 has been transferred and how much has been retained.
 
Id. at 5. The Board did not directly address Jost's contention 
that the right-of-way sales rendered the notice of exemption 
misleading and false, or that the right-of-way sales were 
evidence of abandonment.

 Jost petitioned for review of the Board's decision not to 
reopen the proceeding, arguing that it was arbitrary and 
capricious for the Board not to examine whether the Conser-
vancy was financially capable of being a trail sponsor, not to 
find that the notice of exemption was void ab initio, not to 
reconsider whether interim trail use was appropriate in light 
of the sale of portions of the right-of-way, and not to find that 
the line had been abandoned.

 II. Discussion

A. Standard of Review

 At the outset we must resolve the parties' disagreement 
over the standard of our review of the Board's decision not to 
reopen the proceeding. The Board contends that it is enti-
tled to a particularly deferential standard of review, since 
Jost seeks review of a decision not to reopen a prior proceed-
ing. Jost, however, contends that the Board's decision not to 
reopen the proceeding was clearly arbitrary and capricious 
because it was flatly contrary to the Board's own regulations. 
We agree with neither contention.

 We have recently held that "a petition seeking review of an 
agency's decision not to reopen a proceeding is not reviewable 
unless the petition is based upon new evidence or changed 
circumstances." Southwestern Bell Tel. Co. v. FCC, 180 F.2d 
307, 311 (D.C. Cir. 1999). Southwestern Bell stated that the 
"test for new evidence" is whether the evidence identified by 
petitioners are " 'facts which through no fault of [the petition-
er's], the original proceeding did not contain.' " Id. at 312 

(quoting ICC v. Brotherhood of Locomotive Eng'rs, 482 U.S. 
270, 279 (1987)) (alterations in original).

 In this case, we cannot fault petitioners for the lack of 
information in the record about CKR's right-of-way sales. 
First, the three sales where it is alleged that "full-width" 
right-of-way was sold did not occur until after the notice of 
exemption was filed. In addition, because the grant of a 
NITU appears to be virtually automatic once a potential trail 
sponsor and a railroad indicate their willingness to negotiate 
interim trail use, there is very little time when a request for a 
NITU is pending before the Board.9 Thus, the issuance of a 
NITU is not a typical agency adjudication where any interest-
ed party has an opportunity to put evidence in the record for 
the agency's consideration before the agency reaches its 
decision. We do not see this process as being inconsistent 
with, or an unreasonable interpretation of, the Trails Act, but 
we cannot fault petitioners for failing to raise the question of 
the right-of-way sales in the brief period in which the request 
for a NITU was pending.10

 It is true that the literal language of Jost's petition sought 
to reopen the proceeding on the grounds of "material error," 
which would ordinarily not be a valid basis for a petition for 
review. See Locomotive Eng'rs, 482 U.S. at 280; Southwest-
ern Bell, 180 F.3d at 311. However, Jost repeatedly indicates 

__________
 9 For example, in this case, the first statement of willingness was 
filed April 9, 1997, and the Board decided to issue the NITU on 
April 11, 1997, while the second statement of willingness was filed 
on June 6, 1997, and the Board decided to issue a NITU on June 12, 
1997.

 10 This is not to say that the timing of the petition is irrelevant. 
It may be that the Board is entitled to refuse to reopen a proceed-
ing where there is evidence a petitioner slept on her rights. At oral 
argument, counsel for the Board suggested that the delay in raising 
the issue of right-of-way sales was a valid reason not to reopen this 
proceeding, but there is nothing in the Board's decision which 
suggests that it was relying on that rationale. See SEC v. Chenery, 
332 U.S. 194, 196 (1947) (reviewing court must "judge the propriety 
of [agency] action solely by the grounds invoked by the agency").

that the "material error" he alleges is not that the Board 
wrongly issued the NITU on the basis of the evidence in front 
of it, but rather that the Board's decision was "based on 
inaccurate, incomplete and misleading information provided 
by [CKR]." Joint Appendix ("J.A.") at 94; see also id. at 103 
("STB's imposition of trail use conditions on the railroad 
corridor was in material error because it was based on 
inaccurate and insufficient facts presented to the STB.").

 Thus, we believe that it is clear that the purpose of Jost's 
petition was not to challenge the Board's reasoning but to 
bring new material to its attention, and therefore the decision 
not to reopen the proceeding is reviewable. See Fritsch v. 
ICC, 59 F.3d 248, 252 (D.C. Cir. 1995) (reviewing ICC's 
decision not to reopen abandonment/trail condition proceed-
ing because "[w]e ... interpret Locomotive Engineers as 
permitting merits review of a refusal to reopen where the 
motion to reopen was based on non-pretextual grounds of new 
matter or changed circumstances, and not merely on material 
error in the original agency decision").

 While we believe that the Board's decision not to reopen is 
reviewable, we do not accept Jost's contention that the Board 
was required to reopen the proceeding once he filed a petition 
containing new evidence. There is nothing in the Board's 
regulations governing either petitions for reconsideration or 
petitions to reopen proceedings which requires the Board to 
grant such a petition. See 49 C.F.R. ss 1115.3, 1115.4. 
Accordingly, we will review the Board's decision not to reopen 
the proceeding under the familiar arbitrary and capricious 
standard. See 5 U.S.C. s 706(2)(A).

 "The requirement that agency action not be arbitrary and 
capricious includes a requirement that the agency adequately 
explain its result. The arbitrary and capricious standard of 
the APA mandates that an agency take whatever steps it 
needs to provide an explanation that will enable the court to 
evaluate the agency's rationale at the time of decision." 
Dickson v. Secretary of Defense, 68 F.3d 1396, 1404 (D.C. Cir. 
1995) (internal quotation marks, brackets and citations omit-
ted). "[W]e may not supply a reasoned basis for the agency's 

decision that the agency itself has not given. We will, 
however, uphold a decision of less than ideal clarity if the 
agency's path may reasonably be discerned." Motor Vehicles 
Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 
43 (1983) (citation omitted). In this case, we can discern the 
agency's rationale with regard to the question of the Conser-
vancy's fitness to be a trail sponsor. We are, however, unable 
to discern the agency's path in addressing CKR's sale of 
portions of the right-of-way.

B. CKR's Right-of-Way Sales

 Jost presented three reasons why the alleged sale of full-
width sections of the right-of-way required the Board to 
reconsider its decision to allow interim trail use over the line. 
First, Jost argued that the railroad's failure to disclose the 
sale of portions of its right-of-way constituted false and 
misleading information. See 49 C.F.R. s 1152.50(d)(3) (notice 
of exemption void ab initio if it contains false or misleading 
information). Second, Jost argued that the sale of full-width 
right-of-way would cut the rail line in two, making it impossi-
ble to "rail bank" any part of the line, and therefore making 
interim trail use inappropriate. Third, Jost argued that the 
sale of portions of the line was additional evidence that CKR 
consummated abandonment of the line, and therefore the 
Board lost jurisdiction over the line, prior to issuance of the 
NITU.

 It appears that the sale of full-width right-of-way would be 
material to the Board's decision in all of these three areas. 
On the first issue, the Board argues in its brief that CKR's 
notice of exemption is not void because there was no material 
false statement. The Board relies on the fact that sale of the 
right-of-way would not affect CKR's ability to use the exemp-
tion proceeding to abandon the line. However, sale of full-
width right-of-way certainly could affect CKR's ability to 
obtain a NITU and convey the line for interim trail use. We 
do not see--and the Board has not seen fit to tell us--why 
false statements that affect the issuance of a trail condition, if 
not the exemption itself, are not material to the proceeding. 
At oral argument, counsel for the Board also suggested that 

CKR may not have been under any obligation to inform the 
Board that it had sold off portions of the right-of-way once it 
filed its notice of exemption. Thus, it is possible that the 
notice was not void ab initio because at the moment it was 
filed it did not contain any material false statements, since 
the right-of-way sold up to that point was not "full-width," 
and did not bisect the line. However, we are extremely 
reluctant to accept that theory as a valid basis for upholding 
the Board's decision, particularly in the absence of any evi-
dence that the Board itself relied on such a theory. In the 
first place, it appears that five sales of right-of-way took place 
before the notice of exemption was filed, and the Board never 
addressed the significance of those sales to the feasibility of 
either conversion to trail use or eventual reinstitution of rail 
service.11 See J.A. 117-18. Perhaps more importantly, in the 
absence of a definitive statement by the Board that petition-
ers are under no obligation to supplement a filing which 
becomes false or misleading due to subsequent events, such 
as the later sale of full-width right-of-way, we do not think 
counsel's statement at argument, that no regulation specifical-
ly requires updating information in the notice of exemption, is 
sufficient to demonstrate that the Board takes such a parsi-
monious and time-limited view of its own regulations barring 
false statements.12 Cf. 49 C.F.R s 1114.29 (party engaged in 
discovery in a Board proceeding "is under a duty seasonably 
to correct his response" if he "knows or later learns that his 
response [to a discovery request] is incorrect"). Since the 
Board never discussed the false statement issue in its deci-
sion, we cannot assume that any false statements CKR may 
have made were not material.

__________
 11 Since apparently none of these sales involved "full-width" right-
of-way, there might be good reason for the Board to find that the 
omission of these sales was not a material false statement, even as 
to the NITU. However, we are not willing to assume such a finding 
in the absence of any discussion by the Board of the question.

 12 It is possible that such a limited view of what constitutes a false 
statement could itself be "arbitrary, capricious, an abuse of discre-
tion, or otherwise not in accordance with law," but we have no 
occasion to decide that question here. 5 U.S.C. s 706(2)(A).

 As to the second issue, the effect of right-of-way sales on 
rail banking, we do not read the Board's decision as saying 
that, if full-width right-of-way sales had taken place, that fact 
would not be material to its decision to impose a trail condi-
tion. The Board recognized that the parties were contesting 
whether "CKR's [sales] have made interim trail use and rail 
banking impossible" and indicated that if Jost's allegations 
proved to be true, the Board "would revisit the issues." 
CKR--Abandonment Exemption, slip op. at 5. Again, we see 
no reason, and the Board's decision gives us none, why the 
possibility that full-width sales occurred would not be materi-
al to the Board's decision to impose a trail condition.

 Finally, we also think that the sale of right-of-way is 
material evidence for the Board to consider in deciding 
whether CKR abandoned the line prior to the issuance of the 
NITU. We have previously indicated that "the pivotal issue" 
in determining whether a railroad has consummated abandon-
ment "is the intent of the railroad--as evidenced by a spec-
trum of facts varying as appropriate from case to case." Birt 
v. STB, 90 F.3d 580, 585 (D.C. Cir. 1996) (internal quotation 
marks omitted). In this case, the Board looked to CKR's 
discontinuance of service, its removal of rails, ties and ballast, 
its negotiations over interim trail use, and its ultimate state-
ment that it had conveyed the line for interim trail use. We 
can see no reason why the sale of portions of the right-of-way 
would not also be an appropriate fact for the Board to 
consider in evaluating the intentions of the railroad. It would 
be strange, to say the least, if the removal of rails, ties and 
ballast were material facts, but the sale of the entire right-of-
way at a given point were not. Cf. RLTD Ry. Corp. v. STB, 
166 F.3d 808, 812 (6th Cir. 1999) (upholding Board's conclu-
sion that "a de facto abandonment occurred because the line 
was no longer linked to and part of the interstate rail 
system") (internal quotation marks omitted).

 Since the possibility that CKR had sold off full-width right-
of-way was material to the issues before the Board, the Board 
needed to address forthrightly the issue of whether CKR did 
sell off full-width right-of-way, or, at least, explain why the 
possibility that full-width right-of-way was sold would not 

alter the Board's decision to issue a NITU. However, the 
only reference by the Board to any of these issues was the 
passage quoted at length above. Unfortunately, that passage 
is entirely too opaque to enable us to review meaningfully the 
Board's decision.

 It is possible to read the sentence which states that "CKR 
has refuted [Jost's] allegations" as a factual finding by the 
Board, based on the affidavits in the record, that CKR had 
not sold full-width right-of-way. In that case, we could 
review the Board's finding to determine whether it had 
sufficient support in the record not to be arbitrary and 
capricious. However, in the very next sentence, the Board 
states that it "will not attempt to resolve all of the property 
issues that these filings raise," and suggests that the parties 
should resolve their differences in state court.13

 The basis for an administrative action

 must be set forth with such clarity as to be understanda-
 ble. It will not do for a court to be compelled to guess at 
 the theory underlying the agency's action; nor can a 
 court be expected to chisel that which must be precise 
 from what the agency has left indecisive. In other 
 words, [w]e must know what a decision means before the 
 duty becomes ours to say whether it is right or wrong.
 
SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) (internal 
quotation marks omitted).

 In this case, we simply cannot tell what the decision means, 
i.e., on what basis the Board concluded that Jost's evidence of 
the sale of full-width right-of-way did not require reopening 

__________
 13 The Board's brief similarly attempts to straddle these two 
approaches. In one place the brief states that "[t]he Board placed 
substantial weight on CKR's verified statement ... [and] concluded 
that petitioners had not proven that the conveyance of interests in 
certain lots ... makes reactivation of rail service impossible." 
Resp'ts' Br. at 13. Elsewhere the brief suggests that the Board 
"declined to speculate on the outcome of a [state court] quiet-title 
action," id. at 24, and "[p]roperly [d]eferred" to a state court 
determination. Id. at 23.

the proceeding. It appears unlikely that the Trails Act either 
requires the Board to determine for itself in every case the 
validity of the railroad's property rights, or allows the Board 
to disregard totally prima facie evidence that the railroad no 
longer owned an adequate right-of-way. Cf. Idaho N. & Pac. 
R.R. Co.--Abandonment & Discontinuance Exemption--In 
Washington & Adams Counties, ID, Docket No. AB-433 
(Sub.-No. 2X) (April 1, 1998) ("Idaho Northern") ("[I]f a trail 
use arrangement is successfully negotiated, and a landowner 
or other interested party presents evidence to call into ques-
tion the continued application of the Trails Act, we would 
reopen the proceeding to afford the trail user an opportunity 
to demonstrate that it continues to meet the requirements of 
the statute.").14 At the same time, even if some full-width 
right-of-way was sold, it may be that the Act authorizes 
interim trail use over the remaining right-of-way, assuming 
the Board retains jurisdiction over the line. We would defer 
to the Board's reasonable interpretation of what the Act 
requires, see Chevron U.S.A. Inc. v. Natural Resources De-
fense Council, Inc., 467 U.S. 837, 842-43 (1984), if we could 
discern the Board's interpretation in its decision.

 Unfortunately, the Board's decision "cross[es] the line from 
the tolerably terse to the intolerably" elliptic. Greater Bos-
ton Television Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 
1970). The Board needs to articulate how it proceeds when 
faced with an allegation that sales of full-width right-of-way 
have occurred, and why it believes that practice is consistent 
with statutory requirements governing its jurisdiction and the 

__________
 14 We do not hold that the Board is required to resolve disputed 
issues of state property law, or even that the Board is necessarily 
required to reopen the proceeding on the evidence presented by 
Jost. If the Board chooses to reopen the proceeding, it may be 
appropriate for the Board to stay proceedings pending action in a 
state court. Alternatively, the Board may choose to make its own 
determination, subject to revision upon notice of a final state court 
judgment. We only require that the Board address the material 
issues of fact which have been raised concerning the applicability of 
the Trails Act in whatever way the Board finds most consistent with 
the language and goals of the Act.

Trails Act. At that point, if petitioners are still dissatisfied, 
this court will have something to review.

 If the Board was elliptic about why it need not consider 
whether the sales made rail banking impossible, it was mute 
on why it need not consider whether the sales made CKR's 
notice of exemption void, or constituted evidence of abandon-
ment of the line. Again, we presume neither to suggest a 
rationale nor to find one in the tea leaves of the Board's 
opinion. We simply hold that the Board must articulate the 
reasoning behind its decision with sufficient clarity to enable 
petitioners and this court to understand the basis for its 
decision.

C. The Conservancy's Fitness to Serve as Trail Sponsor

 The Board's treatment of Jost's challenge to its decision 
not to reopen the proceeding to examine the financial fitness 
of the Conservancy to serve as trail sponsor illustrates well 
the Board's ability to articulate the basis for its decision. 
Jost's petition, construed somewhat generously, challenged 
both the Board's general policy concerning financial "fitness 
tests" and the application of that policy to the Conservancy. 
In rejecting Jost's challenge, the Board clearly stated the 
standard it was applying, the rationale for that standard, and 
why the petition did not satisfy that standard.

 In its decision, the Board followed and restated the policy 
with regard to financial "fitness tests" that was explained in 
Idaho Northern. In Idaho Northern, the Board indicated 
that it interpreted the phrase "qualified private organization" 
in section 1247(d) to mean any organization willing to assume 
management and financial responsibility for the line in ques-
tion. In this case, as in Idaho Northern, the Board noted 
that negotiation over a trail condition delays abandonment of 
a line, and extends the railroad's responsibility for the right-
of-way. Accordingly, "the primary purpose of a fitness test 
would be to protect a railroad from wasting its time negotiat-
ing with an unfit trail sponsor. However, the railroad al-
ready has the ability to protect itself from that result merely 
by refusing to consent to the issuance of the trail condition." 
CKR--Abandonment Exemption, slip op. at 4; see also Idaho 

Northern (employing similar reasoning and noting that ten 
years of experience with the Act had not shown any problem 
with trail sponsors failing to meet their responsibilities). The 
Board stated that not only was a financial fitness test for trail 
sponsors unnecessary, but such a test would be contrary to 
the intent behind the Trails Act because it could have the 
effect of deterring or delaying interim trail use.

 For these reasons, the Board applies a presumption that 
any private organization that files a statement of willingness 
meets the statutory requirement to be a trail sponsor. How-
ever, the Board's presumption that a trail sponsor is qualified 
is rebuttable. The Board has indicated that "if it is shown 
that the trail sponsor does not have the ability to continue to 
meet the financial and liability conditions of the statute, the 
trail condition would be involuntarily revoked." CKR--Aban-
donment Exemption, slip op. at 4-5.

 Jost characterizes this policy as an abdication of the 
Board's statutory responsibilities. We disagree and conclude 
that the Board's policy is a reasonable interpretation of its 
obligation under the statute. There certainly is nothing in 
the statute which expresses a congressional intent contrary to 
the Board's practices. Cf. Chevron, 467 U.S. at 842-43 
("[T]he court, as well as the agency, must give effect to the 
unambiguously expressed intent of Congress."). The Trails 
Act is virtually silent on what makes a private organization 
"qualified" to be a trail sponsor. The Act is clear, however, 
that the Board "shall" impose a trail condition, and not permit 
abandonment of a line, whenever a railroad is prepared to 
convey the right-of-way to an organization that is "prepared 
to assume full responsibility" for management of the line, for 
liability, and for taxes owed. 42 U.S.C. s 1247(d) (Supp. III 
1998); see also Goos v. ICC, 911 F.2d 1283, 1295 (8th Cir. 
1990) (statute gives agency "little, if any, discretion to fore-
stall a voluntary agreement to effect a conversion to trail 
use"). It is certainly reasonable for the Board to draw from 
the Act a congressional intent "to preserve for possible future 
railroad use rights-of-way not currently in service and to 
allow interim use of the land as recreation trails," Preseault, 
494 U.S. at 6, and to carry out its mandate in ways that 

further, rather than unnecessarily hinder, those goals. The 
Board's explanation of why a presumption of fitness is consis-
tent with the goals of the Act is reasonable. See CKR--
Abandonment Exemption, slip op. at 4 ("A railroad presum-
ably would not agree to negotiate with a prospective trail 
sponsor unless the railroad believes the trail sponsor will be 
able to manage the right-of-way and assume legal liability and 
pay taxes. ... Pending an agreement with the proponent of 
any interim trail, or the consummation of the abandonment, 
the right-of-way remains the responsibility of the railroad. 
Thus, the carrier is the most appropriate party to determine 
whether any offer is likely to prove successful both in meeting 
the railroad's desires and in fulfilling the statutory and regu-
latory liability requirements of the Trails Act. Requiring the 
proponent of a trail ... to pass a fitness test whenever the 
Board issues a trail condition could deter or delay interim 
trail use, which would be contrary to Congress' intent to 
facilitate and encourage rail banking and interim trail use 
....") (citation omitted). In short, we believe the Board's 
use of a rebuttable presumption in these circumstances is a 
reasonable interpretation of the Trails Act, and, therefore, we 
will not overturn it.15 See Chevron, 467 U.S. at 845.

 Having found the Board's policy to be reasonable under the 
statute, the next question is whether the Board's application 
of that policy in this case was arbitrary and capricious. See 5 
U.S.C. s 706(2)(A). Jost argues that he presented sufficient 
information to rebut the presumption that the Conservancy 
was capable of meeting its responsibilities as trail sponsor. 
The information Jost presented was that three local govern-
ments had expressed their opposition to interim trail use, and 
also that Kansas state law would impose substantial responsi-
bilities on a trail sponsor, such as weed and litter control, and 
the installation of signs and fencing.

 The Board found that "there has been no specific showing 
here that the trail sponsor has not met, or likely will not be 
able to meet, its financial obligations regarding this trail." 
CKR--Abandonment Exemption, slip op. at 5. The Board 

__________
 15 Similarly, we see nothing in the Trails Act that requires the 
Board to license petitioners to engage in discovery of the financial 
fitness of potential trail sponsors.

stated that "the Trails Act does not require a trail to be 
'developed' in any particular way" and "there is no absolute 
time limit for how quickly a trail must be developed to its 
intended level of use." Id.

 We see no basis for finding that this conclusion was arbi-
trary or capricious. Jost offered nothing but speculation that 
the Conservancy would be unable to meet its responsibilities. 
The Conservancy never indicated to the Board that it was 
relying on local governments for funding, so it is not clear 
why their opposition should raise any inference that the 
Conservancy could not raise needed funds. In the absence of 
any real evidence that the Conservancy was failing to meet, 
or would fail to meet, its responsibilities, there is no reason to 
believe that the presumption of financial fitness had been 
rebutted. Accordingly, we will uphold the Board's decision 
not to examine the Conservancy's fitness to be a trail sponsor.

 III. Conclusion

 We conclude that the Board's decision not to reopen the 
proceeding to examine Central Kansas Conservancy's fitness 
to be a trail sponsor was not arbitrary and capricious. How-
ever, because we are unable to discern the basis for the 
Board's decision that it was unnecessary to reopen the pro-
ceeding to consider Central Kansas Railway's right-of-way 
sales, we remand this case to the Board for further proceed-
ings consistent with this opinion.

 So ordered.