976 A.2d 484

Sally L. MOODY, Robert J. Moody, Fred J. Brient, Jr., Cynthia I. Brient, William Duff McCrady, William A. Lucas, A.J. Lucas, Glenn G. Beatty, Sharon L. Beatty, Rodney J. Denardo, Melissa Denardo, Dennis H. Iseman, William R. Iseman And Estate Of Mary E. Keller, David J. Kushon, and Janie B. Kushon, Appellants

v.

ALLEGHENY VALLEY LAND TRUST, Armstrong County Conservancy Charitable Trust, Armstrong Rails to Trails Association, Consolidated Rail Corporation, Jerry F. Longwell, Lee J. Calarie, David R. Ruppert, Norman Karp, and Wilhelminna Decock, Appellees.

Supreme Court of Pennsylvania.

Argued Sept. 8, 2008.

Decided July 22, 2009.

656

Donald Bartlett Smith, Esq., Lansdale, for Sally L. Moody, et al.

John Wright Zotter, Esq., Dara A. DeCourcy, Esq., Zimmer Kunz, P.L.L.C., Pittsburgh, for Armstrong Rails to Trails Association, et al.

Dennis J. Kusturiss, Esq., Vuono & Gray, L.L.C., Pittsburgh, for Allegheny Valley Land Trust, et al.

David P. Helwig, Esq., Marks, O'Neill, O'Brien & Courtney, P.C., Pittsburgh, for Armstrong County Conservancy Charitable Trust, et al.

William Jones Cressler, Esq., PA Department of Transportation, Harrisburg, for amicus curiae Commonwealth of Pennsylvania Department of Transportation.

Neal Brendel, Esq., William D. Semins, Esq., K&L Gates, L.L.P., Pittsburgh, for Rails–To–Trails Conservancy.

Marth Riegel Smith, Esq., PA Department of Conservation & Natural Resources, for amicus curiae Pennsylvania Department of Conservation and Natural Resources.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice GREENSPAN.

■ In this appeal, we hold that as long as the requirements of Section 1247(d) of the National Trails System Act are met, a railroad right-of-way is "railbanked" regardless of whether the rail operator agrees to resuscitate service. Accordingly, we affirm the Superior Court's decision below.

■ Railbanking is the preservation of an easement that was previously used as a rail thoroughfare by allowing interim trail use on the right-of-way, subject to revitalization of rail service at a later date, consistent with the requirements of Section 1247(d) of the National Trails System Act, 16 U.S.C. §§ 1241–1251 ("National Act").

The right-of-way, or easement, at issue here is a section of former railroad track in Armstrong County, Pennsylvania. Appellants are landowners of the servient estates.[1] Conrail, the former holder of the contested right-of-way, obtained permission from the Interstate Commerce Commission (ICC) (now the Surface Transportation Board (STB)) to abandon rail service on the right-of-way. After receiving permission to abandon service, Conrail entered into an agreement with Appellee Armstrong County Conservancy (the Conservancy) to convey the right-of-way to an organization nominated by the Conservancy. The Conservancy nominated a rails-to-trails organization, the Allegheny Valley Land Trust (the AVLT), to receive the right-of-way. In early 1992, Conrail conveyed the right-of-way to the AVLT by quitclaim deed; the

---

1. The appellants are Sally L. Moody, Robert J. Moody, Fred J. Brient, Jr., Cynthia I. Brient, William Duff McCrady, William A. Lucas, A.J. Lucas, Glenn G. Beatty, Sharon L. Beatty, Rodney J. Denardo, Melissa Denardo, Dennis H. Iseman, William R. Iseman and Estate of Mary E. Keller, David J. Kushon, and Janie B. Kushon.

AVLT appended a Declaration of Railbanking to the quitclaim deed upon recording it.[2] Conrail turned over responsibility for maintenance of road crossings and bridges on the right-of-way to the AVLT, the Conservancy, and Armstrong County.

In 1995, Appellants filed a complaint against Conrail and Appellees the AVLT, the Conservancy, Armstrong Rails to Trails Association, and the officers of these organizations.[3] Appellants sought to enjoin alleged trespasses and to obtain a declaratory judgment that Conrail had abandoned the right-of-way and therefore their property was no longer subject to an easement.[4] The Armstrong County Court of Common Pleas found that the right-of-way had been abandoned and that the servient estates were therefore no longer subject to an easement. On appeal, the Superior Court reversed, holding that evidence of cessation of rail service coinciding with transfer of the right-of-way to a "rails-to-trails" organization cannot support a determination that the property was abandoned to Appellants under state law. *Moody v. Allegheny Valley Land Trust*, 930 A.2d 505, 507 (Pa.Super.2007).

We granted Appellant's petition for allowance of appeal to address: 1) whether the Superior Court erred in a) reversing the trial judge's determination that Conrail, as a matter of law, intended to abandon the easement without railbanking;

**2.** The Declaration of Railbanking included the following language:

Grantee in the attached Deed ... pursuant to the provisions of the National Trails Systems Act (16 U.S.C. § 1247(d)) and regulations promulgated thereunder, does by the acceptance of this Deed declare that the following established railroad lands, rights-of-way, and easements which are conveyed by this Deed are preserved as an interim recreational use trail and are railbanked for future rail service, related transportation purposes or other uses as provided for by the National Trails System Act."
R.R. 147a.

**3.** Conrail is no longer a party to this dispute.

**4.** Appellants also filed suit in federal court against the local township. *Lucas v. Township of Bethel ("Lucas I ")*, 319 F.3d 595 (3d Cir.2003) (determining that the ICC and its successor, the STB, no longer have jurisdiction over the right-of-way in question); *Lucas v. Township of Bethel ("Lucas II ")*, 137 Fed.Appx. 450 (3d Cir.2005) (upholding summary judgment against Appellants as to their 42 U.S.C. § 1983 claim and declining exercise of jurisdiction over state law claims).

and b) holding that sale of a former railroad easement to a private trail sponsor results in a railbanking and that trail use constituted continued rail use under Pennsylvania law; and 2) whether the Superior Court's holding in favor of the Appellees resulted in an unconstitutional taking of Appellants' property. The questions presented are questions of law and this Court's scope of review is therefore plenary. *Phillips v. A–Best Products Co.,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

In this case, the parties agree on all material facts, but characterize the legal import of those facts very differently. The essence of the dispute is whether an effort to railbank a railroad right-of-way via the private railbanking process can be effective if the railroad does not agree to be bound to resuscitate service if directed to do so at a later date. We hold that the manner of railbanking at issue here was effective and a railbanking did result. Accordingly, Appellants' claim that the right-of-way was abandoned, and the easement over their land extinguished, is without merit and we therefore affirm the Superior Court.

Appellants' basic claim here is that, because the railroad operator no longer remains obligated to provide service in the future, it is against existing law and public policy to hold that a railbanking has occurred. Appellants claim railbanking cannot be accomplished unilaterally, even by a qualified railbanking organization such as the AVLT. Because in their view there was no proper railbanking, Appellants see the right-of-way as abandoned and the property interest therein as having reverted to them.

With regard to abandonment of such easements, this Court has stated:

In evaluating whether the user abandoned the property, the court must consider whether there was an intention to abandon the property interest, together with external acts by which such intention is carried into effect. *Lawson v. Simonsen,* 490 Pa. 509, 417 A.2d 155, 160 (1980); *see also Burnier v. Dep't of Envtl. Resources,* 148 Pa.Cmwlth. 530, 611 A.2d 1366, 1368 (Pa.Cmwlth.1992). In order to estab-

lish the abandonment of a right-of-way, the evidence must show that the easement holder intended to give up its right to use the easement permanently. *Thompson v. R.R. Preservation Society,* 417 Pa.Super. 216, 612 A.2d 450, 453 (1992). "Such conduct must consist of some *affirmative act* on his part which renders use of the easement impossible, or of some *physical obstruction* of it by him in a manner that is inconsistent with its further enjoyment." *Id.* (emphasis in original); *see also Piper v. Mowris,* 466 Pa. 89, 351 A.2d 635, 640 (Pa.1976). Mere nonuse by the railroad does not amount to abandonment. *Lawson,* 417 A.2d at 160; *see also, Burnier, supra.*

*Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659, 664–65 (2002).

Appellants argue that Conrail's application for and receipt of permission to abandon the rail lines it had maintained on the right-of-way in question, combined with what they characterize as Conrail's "refusal to railbank," satisfy the test for abandonment of an easement as laid out in *Buffalo Township.* There, however, this Court held that a railbanking effort substantially similar to the one at issue here was effective. The only legally significant difference between this case and *Buffalo Township* is that in this case, the railroad holding the right-of-way did not *explicitly* agree to resuscitate rail service on the right-of-way in the future if directed to do so. Apparently, Appellants see Conrail's failure to agree to be *bound* to resuscitate service as constituting a "refusal to railbank," despite the fact that Conrail sold the right-of-way to the AVLT, a qualified railbanking organization. Moreover, that organization did, in fact, convert the right-of-way to trail use while maintaining its viability as a rail thoroughfare, in every way consistent with the goals and procedures of private railbanking.

The agreement between Conrail and the AVLT provides that Conrail can provide rail service in the future. In addition, the AVLT appended a Declaration of Railbanking to the deed. With this Declaration the AVLT confirmed that it would preserve the right-of-way for future rail use while

allowing interim trail use, consistent with Section 1247(d) of the National Act, which provides:

in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with [the National Act], if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247.

Viewing the transactions in the instant case in their entirety, we hold that Conrail's sale of the right-of-way to a qualified railbanking organization like AVLT, that filed a Declaration of Railbanking at the time the deed was recorded, did not result in abandonment of the right-of-way. Conrail owned a right-of-way; it sold that right of way to an organization that a) planned to use it as a right-of-way and b) planned to hold it subject to revitalization of rail lines in accordance with the requirements of Section 1247(d) of the National Act and consistent with the railbanking requirements established in *Buffalo Township*, 813 A.2d at 670.

In *Buffalo Township*, this Court established that private railbanking is valid as long as the terms of the railbanking are in compliance with Section 1247(d) of the National Act. That section requires that the interim use be subject to subsequent restoration of rail use and that the railbanking organization take responsibility for management of the right-of-way and all associated liability and taxes. These requirements were satisfied in this case. Section 1247(d) does not require that the railbanking organization be a government entity, nor does it require that the particular rail operator relinquishing the right-of-way remain obligated to renew service at a later date, as Appellants argue. Railbanking consistent with the requirements of Section 1247(d) means that the right-of-way is preserved for future use by another rail operator, or perhaps even by Conrail. We hold a proper railbanking was accomplished here.

*Amici* Pennsylvania Department of Conservation and Natural Resources, Pennsylvania Department of Transportation, and Rails–to–Trails Conservancy each emphasize the strong policy reasons supporting recognition and enforcement of railbanking. They point to the legislative concerns underlying both the National Act and the Pennsylvania's Rails to Trails Act, 32 P.S. §§ 5611–5622 (the State Act), which authorizes Pennsylvania's Department of Environmental Resources to develop rail-trails, and also authorizes counties and municipalities to accept title to railroad rights-of-way by quitclaim or warranty deed. Both the National and State Acts "display a strong legislative policy encouraging the preservation of railroad rights-of-way by using existing rights-of-way for interim recreational trail use." *Buffalo Township,* 813 A.2d at 667. *Amici* point out that rail transport is extremely efficient and is currently undergoing its largest development boom in more than a century. Revitalization of rail lines may well be essential to revitalizing the nation's economy in the coming years. The legislative intent of the National and State Acts expresses an interest in preserving railroad easements even where rail service is no longer active, and Section 1247(d) of the National Act places appropriate conditions on when preservation of such easements can be effective.

In *Buffalo Township,* this Court pointed to the rail operator's continuing obligation by agreement to restore rail service as a factor leading to the conclusion that a railbanking had occurred. 813 A.2d at 670. However, such continuing obligation is not the only requirement we must consider in evaluating the instant situation. Given the strong public policy interests that support promotion of railbanking, and this Court's holding in *Buffalo Township* that compliance with Section 1247(d) is the essential test, our decision that no abandonment occurred here follows the letter and spirit of *Buffalo Township.* A contrary holding would undermine *Buffalo Township* and the National and State Acts that informed it.

"[A] railroad right-of-way can be converted to a recreational trail where there is a failure to file an application [to

railbank] with the ICC, so long as the proposed trail user complies with the requirements of section 1247(d)." 813 A.2d at 670. Section 1247(d) of the National Act requires that the railbanking organization accept legal and financial responsibility for the right-of-way, and that the right-of-way be "subject to restoration or reconstruction for rail purposes." 16 U.S.C. § 1247(d). In this case, the AVLT accomplished this by accepting responsibility for the right-of-way and filing a Declaration of Railbanking with the quitclaim deed. Furthermore, as pointed out above, Conrail's failure to agree to be bound to restore service does not negate the potential for restoration by another rail service provider.

Here, the AVLT has taken on all of the obligations required by the National Act, including that the right-of-way be preserved for future rail service. The AVLT must relinquish the right-of-way if it is required for future rail use. Because the requirements of the National Act have been met, the right-of-way has been properly railbanked and there was no abandonment and reversion to Appellants.

■ Appellants nonetheless argue that, by recognizing a railbanked right-of-way here, the Superior Court effected a taking of their property for which they are owed just compensation in accordance with the Takings Clause of the Fifth Amendment to the United States Constitution, and the Eminent Domain Clause of the Pennsylvania Constitution. While the United States Supreme Court has determined that it is possible for a railbanking to result in a taking, *see Preseault v. ICC*, 494 U.S. 1, 8, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990), the Court nonetheless upheld the National Act and stated that when determining the breadth of an easement, courts should look to state law, as "[s]tate law generally governs the disposition of reversionary interests." *Id.* In determining whether a railbanking had effected a taking in light of the United States Supreme Court's earlier decision, the Federal Circuit looked first to whether the rail operator's interest was fee simple or an easement; second, to whether the easements' terms were "limited to use for railroad purposes, or did they include future use as public recreational trails;" and third, to whether

the easements had been extinguished by abandonment. *Preseault v. United States,* 100 F.3d 1525, 1533 (Fed.Cir.1996) (applying Vermont state law to hold that a particular railroad easement was not broad enough to allow subsequent trail use).

Although Appellants argue that the Federal Circuit's *Preseault* opinion directs that the railbanking in the instant case effected a taking of their land, we do not agree. The language of that opinion implies that an easement's terms can either limit the easement to railroad purposes, or explicitly include future use as public recreational trails, but we note these two alternatives are not exclusive. *Id.* (stating that one determinative issue is whether "the terms of the easements [were] limited to use for railroad purposes, *or* . . . include[d] future use as public recreational trails") (emphasis added). Of course, in its reasoning, the Federal Circuit relied on governing state law to determine the scope of the easement in question. *See* 100 F.3d at 1541 (looking to Vermont law to determine the scope of the easement).

■ Indeed, both *Preseault* cases look to state law to determine the scope of the easement in question, a crucial determination in evaluating a takings claim under these circumstances. Therefore we must look at the instant easement itself to establish its extent under Pennsylvania law. "[I]n construing a deed . . . it is not what the parties may have intended by the language used but what is the meaning of the words" that determines what interest is conveyed therein. *Teacher v. Kijurina,* 365 Pa. 480, 76 A.2d 197, 200 (1950). The deed that created the easement at issue here referred to it as a "right of way," and contained the following *habendum* clause: "To have and to hold the said rights and privileges to the use of [Conrail],[5] so long as the same shall be required for the use and purposes of said Road, in as full, perfect and ample a manner as may be necessarily required for the purposes hereby intended." R.R. 76a.[6]

5. The clause actually refers to Conrail's predecessor, the Allegheny Valley Rail Road Company.

6. The easement at issue in the *Preseault* cases did not involve comparable *habendum* clause language.

■ The plain language of the deed's *habendum* clause refers to the right-of-way over Appellants' land as a "Road."[7] It is this property interest in the "Road" that Conrail conveyed to the AVLT. A road is "[a]n open, generally public way for the passage of vehicles, people, and animals," "[t]he surface of a road; a roadbed," "[a] course or path," or "a railroad."[8] By the plain language of the deed's *habendum* clause, there is no reason to confine our understanding of the easement grant as allowing rail service, but not preservation for future rail service. Fundamentally, the deed and its *habendum* clause create an easement to allow travel through the servient estates. Subsequent holders of the easement may not transgress its boundaries, but they do not transgress the use for which it was granted when they use it for hiking and biking. Interim trail use is consistent with the terms of the easement grant.

Furthermore, the language of the *habendum* clause is listed after explicit grants earlier in the deed that allow the easement holder to conduct construction and maintenance on the right-of-way, to construct aqueducts, pipes, and drains, and to bring materials onto the property for those purposes. R.R. 76a. In broad terms, the document grants the easement holder the right to have and maintain a right-of-way through Appellants' property for that easement holder's purposes. The deed contains no language specifying that the easement terminates upon cessation of rail service. During the interim period when it is railbanked and used as a trail, it is still to be used as a right-of-way, to get from the same point A to the same point B, and points in between them. Appellants, as owners of the servient estates, still have the same rights and responsibilities as they did when the trains were running, just as they will have the same rights and responsibilities when rail

7. By this, it is certain that the parties did not mean that the right-of-way should be used as a motorway; automobiles were barely existent and certainly not widely available at the time the easement was created in 1852. It seems most likely that the parties simply meant by "road" a through-way.

8. The American Heritage Dictionary of the English Language (4th ed.2000).

service resumes. Just as a bank preserves deposited funds, railbanking preserves the relationship between the easement and the servient estate—this is a primary purpose of the National Act.

Importantly, Conrail's intent to abandon rail service on the right-of-way must not be confused with Conrail's alleged intent to abandon the right-of-way itself, an intent that is incompatible with the actions Conrail took in selling the right-of-way. It is beyond dispute that Conrail intended to abandon its rail service on the right-of-way, and took steps to effectuate that by, among other things, selling the right-of-way to AVLT. However, as the Superior Court wisely observed, the evidence presented cannot support both the conclusion that Conrail meant to extinguish the right-of-way via abandonment and that it meant to sell the right-of-way to a qualified railbanking organization such as AVLT. 930 A.2d at 507.

It is also important to emphasize that simply characterizing the right-of-way in question as a "railroad right-of-way" does not so limit it, no more than characterizing a right-of-way as a driveway limits the owner of such a thing to driving on it, rather than walking or biking on it. Here, the trail is and must be maintained in rail-ready condition, and must be relinquished for rail service should the need arise. The current owners of the servient estates purchased those estates long after the easement had been granted to Conrail's predecessor railroad, and the amounts the owners paid surely reflected that fact. To limit the right-of-way's terms strictly because of the burden placed on the servient estate would needlessly degrade the easement.

Railbanking, properly conceived, is a method of rail maintenance and preservation rather than a departure from the intentions and purposes of the easement at the time it was granted. The deed's *habendum* clause grants the easement for "so long as the same shall be required for the use and purposes of said Road, in as full, perfect and ample a manner as may be necessarily required for the purposes hereby intended." R.R. 76a. Railbanking provides conservation of this right-of-way in a rail-ready state during a period when

rail service is not feasible, and this is not a departure from the intended "use and purposes" of the easement. On the contrary, consistent with the terms of the easement and the policies behind the National Act, railbanking preserves rail networks for the purposes of rail service in the future. Preservation of a resource for the purposes of using that resource as it was used initially is not a departure from the broadly-stated terms of the easement. This would be true if Conrail were simply halting train service for a period of years in order to update track hardware, and it remains true here. The fact that hikers and bikers will be allowed to use the easement in the interim period is not only beneficial from a policy perspective, it also allows investment in the upkeep of rail networks-for rail purposes-that would not otherwise be available. Although we, like Justice Saylor, wish to protect the constitutional rights of the Appellants, we cannot agree that those rights are transgressed when the language of the deed's *habendum* clause is broad and the purposes of railbanking are so beneficial for rail service, which is of course the very purpose for which the easement was sought and granted in the first place.[9] The property rights of the Appellants have in no way been changed by this railbanking. No taking has occurred.

■ Furthermore, we believe the dissent's view of the easements herein would endanger the value of many transportation networks, which would become susceptible to strategic holdout behavior that may, at every major technological advance, allow a few individuals to gain ransom power over a

9. We note that *Baltimore & Ohio R. Co. v. Bond,* 345 Pa. 360, 29 A.2d 60 (1942), cited by the dissent, involved telegraph lines that had been built on a railroad easement and were owned by Western Union Telegraph Company. Although the *habendum* clause in that case is, as the dissent points out, similar to the one at issue here, the facts in *Bond* are distinguishable in material ways. Surely the situation created by the fixed structures built by the Telegraph Company, for that company's benefit, is dissimilar to the temporary maintenance of a railroad easement as a rail-ready trail in terms of impact on the servient estates. The building of fixed structures for communication rather than transportation services is a departure from the intent of the easement in a way that preservation of the easement for transportation purposes, as in this case, is not.

resource owned by another and relied on by many. At any rate, when servient estates are exposed to nuisances as a result of an easement, the proper remedy is a nuisance suit, not judicial destruction of the easement holder's property. Nor is there reason to believe that trespassing from rights-of-way is a new problem, or that recourse already available by law is insufficient to protect the Appellants from trespassers.

Because Conrail conveyed its own property interest (not Appellants') to the AVLT, and because the AVLT properly railbanked the right-of-way for interim use as a road or trail, no abandonment occurred here. Therefore, Appellants' property interests are not implicated and their claims fail.

Accordingly, we affirm the decision of the Superior Court.

Justice McCAFFERY did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justice BAER and Justice TODD join the opinion.

Justice SAYLOR files a concurring and dissenting opinion in which Justice EAKIN joins.

Justice SAYLOR, (concurring and dissenting opinion).

I recognize the salutary purposes of the national and state legislation designed to preserve railroad corridors while benefiting the public with a recreational resource, as amply developed by the majority. A difficulty arises, however, when the advancement of larger public interests imposes a disproportionate burden on the property of a few individuals. Where this is the case, the public benefit certainly can be preserved, but only by assuring fair compensation to those who are adversely affected.

The threshold issue in this appeal involves the application of the National Trails System Act, 16 U.S.C. §§ 1241–1251, which may operate to displace reversionary interests upon abandonment of railroad rights-of-way converted to trail use, implicating a potential right to compensation from the United States government. *See Preseault v. ICC,* 494 U.S. 1, 8, 11–

13, 110 S.Ct. 914, 920–23, 108 L.Ed.2d 1 (1990). It is one thing to presume that Congress intended to pay for some rights-of-way acquired for rail conversions approved by the Surface Transportation Board, the federal administrative agency vested with regulatory authority over railroads. *See id.* It is quite another to presume compensation should extend to private rail banking endeavors without any federal agency involvement whatsoever. The intent to provide federal funding for private rail banking endeavors seems particularly unlikely where the National Trails System Act itself prescribes a role for the Surface Transportation Board. *See* 16 U.S.C. § 1247(d) ("If a State, political subdivision, or qualified private organization is prepared to assume full responsibility ..., then the [Surface Transportation] Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance or disruption of such use.").

Regardless of the above, I recognize *Buffalo Township v. Jones*, 571 Pa. 637, 813 A.2d 659 (2002), is dispositive on this point. *See id.* at 651–52, 813 A.2d at 670.[1] Moreover, although I find Appellants' arguments related to the permissibility of "unilateral" private rail banking to be colorable, ultimately, I agree with the majority that the National Trails System Act does not make a distinction between rail banking accomplished upon an express agreement of a railroad retaining some residual right of reentry and rail banking accomplished more unilaterally by a trails organization upon the mere consent of a railroad which does not retain a right of reentry. Thus, after *Buffalo Township*, I agree that the

1. I mention the above concerns, because, although I authored a dissent in *Buffalo Township*, my focus was directed to different legal issues pertinent to that decision. Thus, I take this opportunity to express my reservations regarding the applicable Congressional intent. The practical difficulty is that, if the federal government does not ultimately accept this Court's interpretation that Congress intended to fund private rail banking acquisitions, landowners who have legitimate takings claims will have been placed into a sort of legal limbo, in which responsibility for compensation is universally offloaded.

National Trails System Act insulates the rights-of-way under review from reversion under state law.

The remaining issue addressed by the majority is whether the application of the National Trails System Act effectuates a taking in the present case. According to the majority, it does not, since the instruments creating the rights-of-way refer to a "Road," which the dictionary defines, in one alternative, as a "course or path." *See* Majority Opinion, *op.* at 667–68, 976 A.2d at 492. Although recognizing that the dictionary also observes that "road" can be used to signify "a railroad," the majority reasons that "[i]t seems most likely that the parties simply meant by 'road' a through-way." *Id.* at 666 n. 7, 976 A.2d at 491 n. 7.

Contrary to the majority's perspective, I believe there are abundant reasons to conclude that the relevant rights-of-way were railroad rights-of-way, beginning with the identity of the parties in interest—namely, Conrail's predecessor, Allegheny Valley Rail Road Company, and landowners who were being asked to host a right-of-way for the construction of a railroad. Moreover, while the relevant instruments of conveyance are not models of clarity, the references to "Road" are to a particular road (via the use of the phrases "said Road" and "the Road"), commencing immediately after the identification of "Allegheny Valley Rail Road Company." Certainly, it is at least a reasonable interpretation that the reference "said Road" is to the Rail Road that is the subject of Allegheny Valley Rail Road Company's business, since no other references to any other "road" appear on the face of the instrument. Moreover, the instruments enable "the Company to construct and repair the Road, and the right to conduct and carry water by aqueducts and pipes, and the right to make proper drains." It is difficult to envision that property owners would have foreseen a railroad company coming onto their property to construct and repair a recreational trail for hikers and bicyclists as opposed to a railroad.[2] Indeed, in *Baltimore*

---

2. Notably, the majority does not accept that a highway could be constructed through Appellants' lands on the strength of the railroad right-of-way, since the parties would not likely have anticipated it. *See*

*& O.R. Co. v. Bond,* 345 Pa. 360, 29 A.2d 60 (1942), this Court considered similar references to "said road" in an instrument of conveyance for a railroad right-of-way, indicating that "the intent and purpose of the grant was, that a railroad should be located and operated through the grantor's land, advantaging his property, and when the railroad ceased to operate, the grant should terminate." *Id.* at 362, 29 A.2d at 61.[3]  Finally, the instrument at issue in this case extended the right-of-way only "so long as the same shall be required *for the use and purposes of said Road.*" (emphasis added).  The document thus suggests against an understanding that "said Road" would be replaced by an entirely different conception of a road.

It is also very clear that Conrail intended to unconditionally divest itself of its own property interest in the subject rights-of-way under governing state law, and thus, to terminate the

Majority Opinion, *op.* at 666 n. 7, 976 A.2d at 491 n. 7.  It seems as or more unlikely that the parties would have anticipated the construction of a recreational trail.

3.  According to the majority, "the deed contains no language specifying that the easement terminates upon cessation of rail service."  Majority Opinion, *op.* at 666, 976 A.2d at 491.  As reflected above, however, in *Bond* this Court read a materially similar right-of-way instrument as embodying precisely the understanding that termination of the right-of-way occurs upon the cessation of railroad operations.

The majority also cautions that the intent to abandon rail service should not be confused with intent to abandon the right-of-way.  *See* Majority Opinion, *op.* at 667–68, 976 A.2d at 492.  *Bond,* however, demonstrates that, under Pennsylvania law interpreting a right-of-way instrument materially similar to those involved here, continued railway use and the preservation of the right-of-way are integrally intertwined.  *See Bond,* 345 Pa. at 362, 29 A.2d at 61.

The majority undertakes to distinguish *Bond* based on the character of the change in use (telegraph lines, in *Bond,* versus recreational trail use here).  *See* Majority Opinion, *op.* at 668 n. 9, 976 A.2d at 492 n. 9.  It makes no effort, however, to square the material passages of *Bond's* reasoning construing the phrase "said Road" in a railroad easement to mean a "railroad" with its substantially different interpretation of "said Road" to mean, broadly, "a through-way."  Majority Opinion, *op.* at 666 n. 7, 667–68, 976 A.2d at 491 n. 7, 492.  The majority also does not address *Bond's* central determination that the "intent and purpose of the grant was, that a railroad should be located and operated through the grantor's land, advantaging his property, and when the railroad ceased to operate, the grant should be terminated."  *Bond,* 345 Pa. at 362, 29 A.2d at 61.  In these regards, *Bond's* reasoning simply does not

use of "said Road." Conrail obtained federal and state authorization to unconditionally abandon the rail corridor. Consistent with this authorization, it sold all of its interests by quitclaim deed;[4] subsequently, the tracks and associated railroad equipment were dismantled and removed. In answers to requests for admissions, Conrail admitted to consummating "abandonment," according to its own understanding of the term. R.R. at 678a.[5]

The vehicle of preserving potential future rail use via indefinite, interim trail use simply did not exist at Pennsylvania common law; that is the reason for the relevant federal and state enactments. While I am sympathetic to the highly valuable efforts of Appellees to preserve our public resources, I am also cognizant of the protected interests of landowners who are faced with a substantially changed use of their land as a public recreation facility. *See generally Preseault v. United States*, 100 F.3d 1525, 1542 (Fed.Cir.1996) ("When the easements here were granted to the Preseaults' predecessors in

allow for materially different uses of a railroad right-of-way, "interim" or otherwise.

4. A quitclaim deed is an instrument via which a seller conveys whatever interest he may think he has in real property, without any representations or warranties as to actual title. *See Greek Catholic Congregation v. Plummer*, 338 Pa. 373, 377, 12 A.2d 435, 437 (1940).

5. An affidavit from the director of Appellee Allegheny Valley Land Trust also demonstrates the understanding that Conrail did not wish to "become involved" in rail banking, and thus, the decision was made to establish "interim trail use without involving Conrail." R.R. at 475a; *see also* R.R. at 579a, 621a, 632a (reflecting Appellees' admissions that Conrail refused to enter into a private rail banking agreement, intended to "give up its property rights" upon the transfer of its interests to AVLT, and "transferred all future interests in the Rail Corridor [and] it did not did not reserve the right to re-enter the Rail Corridor"). While the majority indicates that the agreement between Conrail and AVLT provides that Conrail can resume rail service in the future, such agreement is "only on such terms and conditions as Grantor and Grantee hereto may hereafter mutually agree upon in writing." It is well settled, however, that such an "agreement to agree" establishes no legally enforceable obligation. *Onyx Oils & Resins, Inc. v. Moss*, 367 Pa. 416, 419, 80 A.2d 815, 816 (1951) ("An agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed compact shall be mutually agreeable."). There is no question that Conrail consented to and cooperated with AVLT in the organization's own rail banking efforts. Conrail, however, did not do so at the expense of its own intention to unconditionally abandon its own interest and participation.

title at the turn of the century, specifically for transportation of goods and persons via railroad, could it be said that the parties contemplated that a century later the easements would be used for recreational hiking and biking trails, or that it was necessary to so construe them in order to give the grantee railroad that for which it bargained? We think not.").

I have no doubt that most hikers are responsible people committed to the preservation of the environment and respect for the property of others. Nevertheless, it would be unfair to presume that all trail users are responsible and landowners will never encounter difficulties with the few who are not. I also do not support the idea that the terms of the railroad rights-of-way at issue here are broad enough to impose on Appellants such burdens as are inherent in the operation of a public recreational trail which, by its nature, invites a diverse population of visitors onto the property.

Again, to the extent the majority's efforts further the advancement of the public interests it emphasizes, they are understandable. However, the United States Supreme Court has cautioned against unduly undermining other constitutional values in pursuit of such aims. *See generally Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."). The majority's broad policy approach suggesting "the value of many transportation networks" are to be preserved through accommodation of "major technological advance[s]," *see* Majority Opinion, *op.* at 668, 976 A.2d at 492, apparently at the expense of select individuals made subject to disproportionate burdens associated with unanticipated uses, is fundamentally at odds with such values. Indeed, the majority's perspective, in this regard, seems inconsistent with its previous explanation that Conrail's right-of-way could not be used for highway purposes, absent just compensation. *See* Majority Opinion, *op.* at 666 n. 7, 976 A.2d at 491 n. 7.

Justice EAKIN joins this concurring and dissenting opinion.