NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12002

ELAINE K. MURRAY & another[1]  vs.  DEPARTMENT OF CONSERVATION AND
RECREATION.


Suffolk.     April 5, 2016. - August 4, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.[2]


Land Court, Jurisdiction.  Jurisdiction, Land Court.  Railroad.
    Easement.  Real Property, Easement.



    Civil action commenced in the Land Court Department on
September 19, 2011.

    The case was heard by Gordon H. Piper, J., on motions for
summary judgment.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    David A. Murray (Peter M. Schilling with him) for the
plaintiffs.
    Frances S. Cohen, Assistant Attorney General, for the
defendant.


_____

    [1] Ruth Levens.

    [2] Justice Duffly participated in the deliberation on this
case prior to her retirement.

SPINA, J.  The plaintiffs appeal from a judgment of the Land Court dismissing without prejudice their action to quiet title under G. L. c. 240, §§ 6-10, for lack of subject matter jurisdiction.[3]  The thrust of their action is that a railroad easement formerly owned by the Pennsylvania Central Transportation Co. (Penn Central) across portions of their lands was abandoned when the United States Railway Association (USRA), acting pursuant to the Regional Rail Reorganization Act of 1973, devised a final system plan which designated certain profitable rail lines that were to be transferred from eight bankrupt regional rail carriers in the northeast and the midwest regions of the country to the Consolidated Rail Corporation (Conrail), but not the rail line over the easement that encumbered their lands.  The plaintiffs contended that the railroad easement over their lands was abandoned by virtue of its nondesignation for transfer to Conrail in the final system plan.  The judge in the Land Court disagreed and concluded that a certificate of abandonment from the Federal Surface Transportation Board (STB) was necessary before a State court could exercise jurisdiction to determine State law claims regarding easements, and that STB's jurisdiction was both exclusive and primary.  The

---

[3] The judgment followed a hearing on cross motions for summary judgment.

plaintiffs appealed, and we transferred the case to this court on our own motion.  We affirm the judgment of the Land Court.

1.  Facts.  The following facts are undisputed.  Boston and Worcester Railroad (B&W) was created in 1831.  In 1847 it filed a "Plan of Location of the Newton Railroad" with the Middlesex County commissioners.  The easement over the plaintiffs' properties appears as part of the proposed railroad line depicted on the 1847 plan of location.  The relevant part of the line was known as the Newton Lower Falls Branch (branch line).  Penn Central succeeded to the B&W interest in the branch line.  In 1970, Penn Central filed for bankruptcy.

The Regional Rail Reorganization Act of 1973, Pub. L. 93-236, 87 Stat. 985 (1973 Act), was enacted by Congress on January 2, 1974 and is codified at 45 U.S.C. §§ 701 et seq. (2012).  The 1973 Act was designed to address the complexities arising from the bankruptcies of eight regional rail carriers in the northeast and midwest region of the country, including Penn Central.  See Regional R.R. Reorganization Act Cases, 419 U.S. 102, 108 (1974) (Regional R.R. Cases).  It created Conrail, which would be tasked with operating railroads in the region, and the USRA, which was to develop a plan to determine which rail lines of the bankrupt railroads would be transferred to Conrail, and which would not.  The result of USRA's charge was the July 26, 1975, final system plan for restructuring railroads

in the northeast and midwest.  The final system plan indicates that the branch line in this case was not designated to be transferred to Conrail.  The final system plan also indicates that the branch line had been last used in May, 1972.

An application to abandon the branch line under § 304(f) of the 1973 Act had been filed with USRA and was pending as of June 26, 1975, the date of the final system plan.  A search of Federal records could not definitively establish whether a certificate of abandonment had ever issued.[4]  In 1976, Penn Central (or its successor or agent) began to remove the rails from the ground of the branch line.  By deed dated November 1, 1982, and recorded with the Middlesex County South registry of deeds, Penn Central granted and released to the Commonwealth all its interest in the branch line.

---

[4] That application was specifically mentioned in the final system plan in a table comprising a group of § 304(f) applications that had neither been granted nor denied.  The table included a comment that "[t]he disposition of those applications not approved by [USRA] will follow the line-specific dispositions (contained in section A of this appendix) in accordance with section 304(a) of the [1973] Act.  As provided in this section, upon expiration of the 30-day period after the effective date of the Final System Plan, the Trustees of the applicant railroads in reorganization may give notice to discontinue service or to abandon the property unless someone offers a rail service continuation subsidy under section 304(c)(2)(A) or offers to purchase the property under section 304(d).  If no subsidy or purchase offer is made and the requirements of section 304(a) are fulfilled, the Trustees will be free to discontinue service 60 days after the effective date of notice and will be free to abandon the property 120 days after the effective date of discontinuance."

2.  Discussion.  Generally, before any rail line may be abandoned, a certificate of abandonment must be obtained from the appropriate Federal agency.[5]  From 1920 until 1995, that agency was the Interstate Commerce Commission (ICC).  See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 319-320 (1981), and authorities cited (providing statutory history).  See also Hayfield N. R.R. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 627-629 (1984), and authorities cited (same).  This authority of the ICC to regulate the abandonment of rail lines was "exclusive and plenary."  See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., supra at 321.  In 1995, Congress abolished the ICC and transferred its authority to regulate the abandonment of rail lines to the STB.  See Interstate Commerce Commission Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803; 49 U.S.C. §§ 702, 10501, 10903 (2012).  Title 49 U.S.C. expressly confers exclusive authority to regulate the abandonment of rail lines, with certain exceptions not relevant to this case, upon the STB.  See 49 U.S.C. §§ 10501, 10903. There is no dispute here that Penn Central did not obtain a certificate of abandonment of the branch line from the ICC, and that the STB has not issued a certificate of abandonment for the branch line.

---

[5] Abandonment includes abandonment of easements.  See Presault v. Interstate Commerce Comm'n, 494 U.S. 1, 5, 8 (1990).

An important exception to the exclusive authority of the ICC to regulate rail abandonments developed when, in the early 1970s, "[a] rail transportation crisis seriously threatening the national welfare was precipitated when eight major railroads in the northeast and midwest region of the country entered reorganization proceedings under § 77 of the Bankruptcy Act, 11 U.S.C. § 205." Regional R.R. Cases, 419 U.S. at 108. Penn Central was one of those railroads. "After interim measures proved to be insufficient, Congress concluded that solution of the crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation. Since such a system cannot be created under § 77 rail reorganization law, and since significant [F]ederal financing would be necessary to make such a plan workable, Congress supplemented § 77 with the [1973] Act. . ." (footnote omitted). Regional R.R. Cases, 419 U.S. at 108-109. Under the 1973 Act the USRA was "established as a new government . . . corporation charged with preparing a 'Final System Plan' for restructuring the railroads in reorganization into a 'financially self-sustaining rail service system.'" Id. at 111, citing 1973 Act, § 206(a), (a)(1); 45 U.S.C. § 716(a), (a)(1) (1970 ed. & Supp. III). The deadline for submission of a proposed final system plan to Congress was 570 days after January 2, 1974 (by July 26, 1975), the effective date of the

1973 Act. Regional R.R. Cases, supra at 112-113, citing 1973 Act §§ 207(c), (d), 208(a); 45 U.S.C. §§ 717(c), (d), 718(a) (1970 ed. & Supp. III). The final system plan designated those railroad assets owned by the railroads in reorganization subject to the 1973 Act that were to be transferred to Conrail, the private, for-profit corporation that also was created by the 1973 Act to succeed the bankrupt railroads in the operation of a single rail company. Regional R.R. Cases, supra at 111, citing 1973 Act § 301(a); 45 U.S.C. § 741(a) (1970 ed. & Supp. III).

Of significance to this appeal, the 1973 Act authorized the discontinuance of rail service and abandonment of rail properties (including easements) conformably with the 1973 Act, "notwithstanding any provision of the Interstate Commerce Act (49 U.S.C. [§§] 1 et seq.), or the constitution or law of any State or the decision of any court or administrative agency of the United States or of any State." 1973 Act § 304(c). Section 304(f) of the 1973 Act states:

> "After the date of enactment of this Act, no railroad in reorganization may discontinue service or abandon any line of railroad other than in accordance with the provisions of this Act, unless it is authorized to do so by the [USRA]."

The plaintiffs contend that once the final system plan became effective, and the branch line was not designated for transfer to Conrail, Penn Central was free to abandon service and dispose of the branch line as it chose. They rely on

Regional R.R. Cases, where the Supreme Court said "railroads in reorganization subject to the [1973] Act are free to abandon service and dispose as they wish of any rail properties not designated for transfer under the Final System Plan" (emphasis added). Regional R.R. Cases, 419 U.S. at 116-117, citing 1973 Act § 304(a)-(c); 45 U.S.C. § 744(a)-(c) (1970 ed. & Supp. III). What the plaintiffs ignore is that the Supreme Court's use of the word "free" was qualified by the citation to § 304(a)-(c) of the 1973 Act.

Section 304(a) describes a procedure for discontinuance of service on lines not designated for transfer to Conrail under the final system plan. Although USRA authorization was not required, trustees of a railroad in reorganization desiring to discontinue rail service not designated for transfer under the final system plan were required to give notice in writing, not sooner than thirty days following the effective date of the final system plan, of intent to discontinue such rail service on a date certain not less than sixty days after the date of such notice. See 1973 Act § 304(a)(A)-(B). The 1973 Act required such notice be "sent by certified mail to the Governor and State transportation agencies of each State and to the government of each political subdivision of each State in which such rail properties [were] located and to each shipper who [had] used

such rail service during the twelve months preceding the notice.[6] 1973 Act § 304(a)(C). There is no evidence in the record before us that Penn Central gave the requisite written notice.

Moreover, under § 304(b) of the 1973 Act, rail properties over which rail service had been discontinued under § 304(a) could not be abandoned sooner than 120 days after the effective date of such discontinuance, except for reasons not relevant to this case. After the passage of 120 days, the trustees could abandon such rail properties by giving thirty days' written notice to those persons and entities identified in § 304(a)(C). See 1973 Act § 304(b). As applicable to this case, § 304(c) of the 1973 Act states: "[n]o rail service may be discontinued and no rail properties may be abandoned pursuant to this section . . . after [two] years from the effective date of the final system plan." There is no evidence in the record before us that Penn Central gave the requisite notice under § 304(b) for abandonment of the branch line.

As provided in § 304(f) of the 1973 Act, abandonment could be obtained "other than in accordance with the provisions of [the 1973] Act," that is, other than under § 304(a)-(c), by obtaining authorization directly from USRA. There is no evidence that Penn Central obtained such authorization. Because there is no evidence that Penn Central abandoned the branch line

---

[6] See note 4, supra.

at any time, either by obtaining a certificate of abandonment from the ICC or the STB, or by utilizing the procedures under the 1973 Act's narrow window of opportunity, the judge correctly determined that the question of abandonment of the branch line remains in the exclusive jurisdiction of the Federal government, and that the Land Court does not have subject matter jurisdiction over the plaintiffs' action to quiet title.[7]

Judgment affirmed.

---

[7] We need not address the other issues raised by the plaintiffs, but it does appear that they are not without a remedy. They may commence an "adverse abandonment" proceeding before the Surface Transportation Board. See 49 U.S.C. § 10903(a) (2012). See Consolidated Rail Corp. v. Interstate Commerce Comm'n, 29 F.3d 706, 708-710 (D.C. Cir. 1994). In any event, Congress did not intend for mere nonuse to determine whether a railroad easement should constitute abandonment and removal of such easement from the inventory of unused assets that "remain[] intact for future railroad purposes." Presault v. Interstate Commerce Comm'n, 494 U.S. 1, 8 (1990), quoting H.R. Rep. No. 98-28 at 8-9 (1983).